**UNITED STATES of America, Appellee,**

v.

**Robert P. MARCHAND, Jr., Appellant.**

**No. 1288, Docket 77–1131.**

United States Court of Appeals,
Second Circuit.

Argued June 9, 1977.

Decided Aug. 22, 1977.

Rehearing and Rehearing En Banc
Denied Nov. 1, 1977.

Certiorari Denied Jan. 9, 1978.
See 98 S.Ct. 732.

Jeanne Baker, Cambridge, Mass., Alan M. Dershowitz, Cambridge, Mass. (Rosenberg, Baker & Fine, Cambridge, Mass., and Joseph S. Oteri, Martin G. Weinberg, and Oteri & Weinberg, Boston, Mass., of counsel), for appellant.

Jill A. Jacobson, Asst. U.S. Atty., District of Vermont (George W. F. Cook, U.S. Atty., District of Vermont, Rutland, Vt., of counsel), for appellee.

Before FRIENDLY, TIMBERS and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

Robert P. Marchand, Jr. appeals from his conviction, after a jury trial before Chief Judge Holden in the District Court for Vermont, on one count of an indictment charging the possession and distribution of 180 pounds of marijuana in violation of 21 U.S.C. § 841.[1]

Apart from a serious question under the Fourth Amendment discussed in Part IV below, the appeal has been presented as if this were a case where there is substantial doubt that defendant is the person who committed the crime charged in the indictment. Marchand relies on an array of cases, somewhat weakened as a result of recent Supreme Court decisions, which had laid down stringent requirements to prevent "the awful risks of misidentification" by persons with relatively scant opportunity to observe the defendant, *Brathwaite v. Manson*, 527 F.2d 363 (2 Cir. 1975), *rev'd*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). But, as the trial judge and the jury seem to have been well aware, that is not this case at all. The case is rather one of accomplice witnesses, one of whom had known the marijuana supplier for years. The jury could well have inferred that any difficulty these witnesses expressed about identification was due to unwillingness rather than inability to identify. It was a similar case of seeming unwillingness that led us, in *United States v. De Sisto*, 329 F.2d 929 (2 Cir.), *cert. denied*, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), to rule that previous identification or grand jury testimony of a trial witness could be used not simply for "impeachment" but as substantive evidence—a ruling which Congress has now translated into Federal Rule of Evidence 801(d)(1)(A) and (C). None of this means that Marchand did not have the right, accorded every criminal defendant, to a fair trial in accordance with governing rules of law. It does mean that statements in decisions involving dubious identifications by bystanders, law enforcement offi-

---

1. The indictment also contained a conspiracy count, but this was dismissed before Marchand's arraignment.

cers or victims[2] should not be woodenly applied to the wholly different situation here and that the case offers ample occasion for recalling Judge Learned Hand's observation in *Dyer v. MacDougall*, 201 F.2d 265, 269 (2 Cir. 1952), that a jury is free, on the basis of a witness' demeanor, to "assume the truth of what he denies" although a court cannot allow a civil action, much less a criminal prosecution, to go to the jury on the basis of this alone.

## I. *A Chronological Summary*

Marchand challenges his conviction on the grounds both of trial error and of insufficiency of the evidence properly admitted.[3] Before considering these challenges it will be useful to summarize what admittedly occurred. When we include material that was not before the trial jury, we will so indicate.

Sometime before June 1971, Victor Roy, Jr. became acquainted with a man at bars in Amherst, Mass. When testifying before the grand jury, Roy identified this person as "Big Foot" or "Bob"; at trial he insisted on the appellation "Big Foot". In March or April, 1975, Roy met the same individual, again in a bar in Brattleboro, Vermont; he was with a girl whom Roy identified before the grand jury as Ann.[4] The man gave Roy a telephone number, which Roy called occasionally. In May 1975, Roy, accompanied by Richard Perkins, met the individual at a Howard Johnson's restaurant in Springfield, Mass., to discuss the purchase of marijuana. On two occasions within the following three weeks, Roy and Perkins made purchases of marijuana from Big Foot at the Springfield Howard Johnson's.

During the period June 9–July 16, 1975, there were four one minute phone calls from Perkins' number in Waitsfield, Vt., to the numbers listed in the name of Ann Curtis and Robert Marchand in Guilford, which is near Brattleboro, Vermont; there was proof that Bob Marchand was living with Ann Curtis at the time. On July 17 there was a four minute phone call from Perkins' number to Marchand's. The next day, July 18, Perkins and Roy drove to Brattleboro, waited for a while at the Howard Johnson's restaurant there, met Big Foot and another male, and then drove out into the country, where 180 pounds of marijuana were transferred from Big Foot's car to Perkins'. On this date there were three phone calls to Ann Curtis' number in Guilford which were billed to Perkins' number in Waitsfield. The first, from Perkins' home phone, lasted three minutes. The other two—each lasting not over one minute—were from Brattleboro, where Perkins and Roy met Big Foot for the marijuana transaction. Perkins and Roy were arrested later in the day when they tried to sell the marijuana to an undercover agent.

Roy refused to make any statement to the arresting officer, Agent Handoga of the Drug Enforcement Administration (DEA). Within two weeks after the arrest, Perkins gave Agent Handoga a description of the seller as "a six foot one, 220 pound man with blond hair", aged between 25 and 30, and "big features", defined to include "a big nose, big hands, broad shoulders". About a month later, Perkins who had some ability as a portraitist, drew a sketch which was designed to be a picture of the marijuana supplier.

Agent Handoga testified at the suppression hearing later referred to that in August 1975 he had received information from an undisclosed source that Marchand was

---

2. See discussion at p. 1000 & n. 27 *infra*.

3. Indeed, by making insufficiency the first point of his brief, Marchand seems to argue that the evidence was insufficient even if all was properly admitted. *See also* Appellant's Brief at 26 n. 28.

4. Roy was quite positive about this when he testified before the grand jury in July, 1976. At trial he could not "really . . . recall" whether Marchand had a girl with him and said that his grand jury testimony was "not completely truthful." However, he repeated that the girl's name "could have been Ann." *See* p. 991 *infra*. The jury was amply justified in inferring that it was.

the supplier. Accordingly the Government sought an indictment of Marchand.[5]

In September 1975 Perkins testified before a grand jury. He stated that "he found out [Big Foot's] name was Bob Marchand." Roy did not appear before this grand jury and it was discharged before the investigation was complete, without the filing of an indictment against Marchand.

On April 26, 1976 Perkins was shown fifteen photographs by Agent Handoga and was asked to pick two that most closely resembled the people he had seen at the time of the marijuana transaction. He first picked three and later narrowed his choices to two. One was a photo of Marchand. Perkins testified at the suppression hearing that he did not feel he was being encouraged or pressured to select the photograph that he did but was not certain that the individual depicted was the supplier. Roy, according to his testimony at the suppression hearing, was in Colorado during this period. On his return to Vermont he was served with a subpoena to appear before the grand jury. Immediately before his appearance on July 1, 1976, Roy arrived at the office of the United States Attorney in Burlington and went to a small interview room accompanied by Agent Handoga and Assistant United States Attorney O'Neill. Roy informed the agent that he had received the marijuana from someone named "Bob" or "Big Foot". Agent Handoga showed Roy a series of 14 photographs. On his first and second viewings he selected a photograph of someone he thought to be Jim Hathaway of Burlington; he was told he was in error. On a third viewing Roy selected a photograph of Marchand but add-

ed "this picture looks funny." The agent then produced a larger photograph of Marchand, interjecting "Oh, here's a Bob, what about this one?" Roy responded that the larger photograph "looks similar".[6] The agent then said "Ah, that's Marchand."

In the afternoon Roy testified before the grand jury. We have already covered much of this testimony. Important additions were a statement that he had known the person with whom he and Perkins had communicated in order to buy the marijuana as "Bob" and a confirmation that he had selected the photograph of the person he believed to be Big Foot. After hearing Agent Handoga present his own observations and Perkins' testimony before the earlier grand jury, the second grand jury returned an indictment against Marchand on July 22, 1976. An arrest warrant issued on the same day.

In the interval between Roy's appearance and the indictment, Timothy S. Hillman, a Massachusetts assistant district attorney who was to be called as a defense witness at trial for a reason that will later appear, came to Vermont. Marchand was a "civil client". Hillman had had "occasion to hear that photographs of [his] . . . client had been shown to the Grand Jury" in Vermont.[7] After talking with Roy, Hillman received "the impression that Victor had spoken to some people about an incident involving himself and some marijuana and that during the conversation he had had [sic] that Bob had been mentioned and the whole thing involved some sort of a transaction at the University of Massachu-

---

5. Roy and Perkins had been indicted shortly after their arrest; they pleaded guilty in December, 1975. In March, 1976, Perkins received a suspended sentence and three years probation; Roy received a fine of $2000, a suspended sentence, and 3 years probation.

6. The first photograph suffers from glare. The second appears to have been taken when Marchand was somewhat older.

7. Hillman also characterized the reason for his trip as follows:

I had gone to Vermont when I had received some information to talk to Victor Roy whom I had even known from high school as an acquaintance. I received information and I went to,—up to Vermont, to determine exactly what I had heard and exactly what Victor had said to anybody, if he had. While the prosecutor did not seek to have this made more definite, Hillman, under cross-examination, accepted as a fair characterization that the incident was a warning by Roy for him to tell Marchand that Roy had talked to the federal authorities about the crime.

setts."[8] He had also received information that before testifying before the grand jury Roy had been shown pictures of Marchand and possibly of Ann. Hillman got "the impression . . . that the whole transaction went down at the U. Mass. Bar but whether or not the transaction went down with Bob or that is what he told him. I don't know . . .." He communicated all this to Marchand, who asked what he should do; Hillman gave Marchand directions how to get to Roy's house and "told him to get himself a darned good criminal lawyer and to get investigators sent up right away, because I believed that he was in trouble."

Some time after this, Marchand departed for the Miami area in Florida.[9] Apparently the Government knew that he had, for it sent a photograph of Marchand to the Dade County, Florida, police and Agent Handoga spoke on the telephone to Detective Adcock of the Dade County police about Marchand.

This led to the final episode. At 7:30 a. m. on August 24, 1976, Special Agent Harris of the DEA office in Miami, accompanied by DEA Special Agent McGlassius and two Dade County detectives, Adcock and Sadler, went to the apartment of Robert Higgins in Lauderhill, Florida, to arrest Higgins pursuant to a federal arrest warrant on charges of sale and distribution of marijuana and conspiracy to import marijuana. The group was joined by a uniformed Lauderhill police officer outside the apartment, which had been under surveillance. Higgins answered the door and was placed under arrest. He informed the officers that another person was in one of the bedrooms. Marchand emerged, wearing only a pair of pants. Agent Harris asked one or more of the officers to ascertain his identity and make sure he was not armed.[10] Marchand was allowed to return to his bedroom to don a shirt and was told that, although not under arrest, he could not leave the apartment but should remain seated in the dining room. Meanwhile Agent Harris had gone with Higgins to the latter's bedroom to watch him dress. While Harris was there, Detective Adcock advised him that Marchand was a fugitive from the District of Vermont. This conclusion was based on previous telephone conversations with Agent Handoga, prior observations of a photograph that had been sent to Miami, and inspection of a driver's license she had extracted from a wallet lying on the apartment's dining room table. Agent Harris further verified Marchand's identity by calling Agent Handoga in Vermont and then made the arrest. In the course of the arrest, Harris searched Marchand and removed a small address book and various papers and written notes from a rear pants pocket. One of the notes related to Marchand's conversation with Hillman; we reproduce this in the margin.[11]

## II. *The Suppression Motion*

Marchand moved to suppress the photographic identification by Perkins and Roy and the note seized at the time of his arrest. Chief Judge Holden conducted a hearing and made findings of fact, on which we have relied in the previous section, and conclusions of law.

8. The University of Massachusetts is at Amherst, Mass., where Roy first met Bob/Big Foot.

9. The record is silent as to any efforts to execute in Vermont the arrest warrant issued on July 22. Curiously also the Government made no effort, either at trial or before us, to argue that particularly in light of Hillman's advice Marchand's departure was some evidence of consciousness of guilt, see *United States v. Heitner,* 149 F.2d 105, 107 (2 Cir. 1945); 2 Wigmore, Evidence § 276(4) (3d ed. 1970), and cases from other circuits cited in 1975 Supplement at 36.

10. The record does not reveal how these directions were carried out.

11. —T Bird
   —pictures of Ann & Bob
   —met me at U Mass Bar
     approx        0
   —
     Warren-
       2d house after P.O.
     Mars Hotel
   Victor Roy testified at trial that his home in Warren, Vermont, was two houses down from the post office.

The court denied the motion to suppress Perkins' photographic identification, overruling objections that the array included bearded individuals, some with long hair, whereas the person outlined in Perkins' sketch was clean-shaven with short hair, that the array included two photographs of Marchand, and that Marchand's was one of only two large photographs in the array.

With respect to Roy's identification, the judge found that Roy had made no positive identification of Marchand and also that his identification, "such as it was" was "infected by suggestion." Accordingly he granted the motion to suppress the evidence.

The judge also denied the motion to suppress the note seized on Marchand's arrest. Since we agree with his conclusion but not with his reasons, it is unnecessary to set out the latter.

### III. *The Trial*

Perkins and Roy both testified to the marijuana transaction substantially as set forth in Part I of this opinion. Since there is no dispute that the transaction occurred, there is no need to repeat this.

Perkins testified to having given Agent Handoga the description of "Big Foot" set forth in Part I and supplemented this with a consistent description of the supplier as looking "very large. Very healthy. Very short hair, like a football player would look after he had been working out . . . [and dressed in] shorts or casual pants and T shirt" and tanned and unbearded.[12] Over objection the Government introduced the sketch Perkins had drawn. Although testifying that he had been "trying to draw a picture of the person who gave [him] the marijuana," cross-examination elicited a statement that he had testified at the suppression hearing "when I was drawing it I didn't really feel that it was anything," and further

In my mind, I, when I was sketching it I just sat there for the longest time and didn't really know what to draw and that was just a—I just remember he was a great big, blond-haired guy and he just had big features. And I just drew a big-blond-haired, you know, male features.

He also acknowledged his earlier statement that he "didn't have a terribly good memory of [Big Foot] at the time he made the sketch" and said that when he was drawing it he "just [sat] there with a blank and just like I just drew it" and that when he finished it he was not satisfied that it was a fair and accurate picture of Big Foot. The jury was not bound, as counsel seems to believe, to credit Perkins' disclaimer as against the excellence of his sketch; indeed it could have drawn quite a different inference. Comparison of the sketch with the photograph later selected by Perkins makes it almost impossible to suppose that Perkins had never seen the subject of the photograph.[13]

When asked to make an in-court identification, Perkins was unable to do this, perhaps for the reasons indicated in fn. 12, perhaps for others. He testified that two by-standers and Marchand who stood before him "resemble Bob, Big Foot in some way"; he thought there was "a good possibility" that if Big Foot were standing in front of him, he would be able to make an identification. The jury may have been more impressed by his slip of the tongue shortly thereafter when he was being cross-examined in regard to the sketch (App. p. 333):

Q. Now at the time you made it, you didn't have a very clear vision in your mind of what this Big Foot looked like, did you?

A. I never really did, *except now when he was standing in front of me and it*

12. Apparently Marchand had a beard at the time of trial and also wore glasses, as to which Perkins had no recollection. Timothy Hillman testified that Marchand had at times worn a beard and at other times had not over the past few years.

13. We refer specifically to the fix of the eyes, a protrusion of the lower nostrils, the set of the ears, and what looks like a small dimple on the chin. The chance that Perkins could have dreamed up a face having all these resemblances to the photograph that was later to be exhibited to him, and no significant differences, is almost infinitesimal.

was always a fairly nervous type of arrangement. (Emphasis supplied.) We do not see how this can mean anything else than that the man "standing in front of" Perkins, namely, the defendant Marchand, was Big Foot.

Perkins admitted making the photographic identification but defense counsel brought out that the pictures were selected as being "closest" to his recollection and that he had made no positive identification. The court refused to give an instruction precluding the jury from relying on Perkins' photographic identification as substantive evidence of Marchand's guilt.

The prosecutor also asked Perkins if he could remember Big Foot's phone number. When he could not, she gave Perkins the toll records for his phone for June and July 1975 to refresh his recollection. Perkins chose the number subsequently proved to be that of Ann Curtis and Bob Marchand, stating, "this could be it," though he added on cross-examination that he could not be certain this was Big Foot's number.[14]

The prosecutor called Roy in an effort to secure an in-court identification.[15] Roy didn't see Big Foot in the courtroom although "there's probably a number of people here that might look vaguely like him." On cross-examination Roy picked out four people, including Marchand, all of whom "looked like this Big Foot" but added that Marchand "is not him." The prosecutor

referred to Roy's grand jury testimony where he had named Marchand as the supplier. Instead of reading this, she proceeded, without objection as follows:

Q. And were you telling the truth to the Grand Jury that day?

A. Well, as I said before, I was misleading the Grand Jury to believe, influences,—

Q. Isn't it a fact, Mr. Roy, that you led the Grand Jury to think that you could identify Robert MARCHAND as the person who supplied you with the marijuana?

A. I guess that is what it came down to.

Q. And is that true, Mr. Roy?

A. Is it true that I misled the Grand Jury to believe that—

Q. Is it true that that is what you did, yes.

A. I would say, yes.

After acknowledging that the defendant was a friend, Roy was further questioned along the same lines:

Q. And yet you led a Grand Jury to believe that this person—this friend of yours, was the one who supplied you with marijuana, is that right?

A. Yes, that's what it came out to be.

The prosecutor also questioned Roy about who had accompanied Big Foot when Roy resumed acquaintance with him at a Brattleboro bar. Roy first answered "a girl. . . . I really don't know [her name]

14. After introduction of the telephone toll records evidencing the calls referred to in Part I of this opinion, the defense cross-examined Roy to bring out that he sometimes called Marchand from Perkins' number but allegedly as a prospective purchaser, not seller, of marijuana and that he had called Big Foot on July 18 but could not recall his number. Perkins testified that the July 18 transaction was set up by a call he had received from Big Foot rather than "made to him." The jury, of course, was not required to credit any of these explanations. The telephone calls were stipulated and the jury was free to draw a strong inculpatory inference from them.

15. The judge ruled that an in-court identification would not be tainted by the attempted photographic identification. The ruling was clearly correct on the facts here. The judge's initial basis for excluding evidence of Roy's

examination of the photograph was that he had not in fact made positive identification; it was only later that the ground of suggestiveness was added. We think the former conclusion is belied by Roy's acknowledgement before the grand jury that he had selected the photograph of the person he believed to be the "Bob" from whom he had purchased marijuana. We also doubt the validity of the latter conclusion. Without any suggestiveness, Roy had selected a photograph of "Bob," although saying it looked "funny." We see no impermissible suggestiveness in the agent's then supplying a better photograph of the same person, despite the agent's comment when producing the picture, "OK, here's a Bob, what about this one?" Roy had already narrowed the universe to "Bobs" and had picked out a photograph of Bob Marchand.

but it could have been ANN." When pressed about his somewhat more positive testimony before the grand jury, he couldn't recall whether Big Foot was with a girl, and admitted that he had misled the grand jury. More questioning added to the confusion: Roy had indeed seen Marchand with Ann and knew that they were friends and probably were living in the same house. This led to the following exchange:

Q. Do you recall that you testified in the grand jury that you saw Bob or Big Foot your supplier, with Ann?

A. That is the way the grand jury testimony reads.

Q. And is that the same Ann you know as a friend or companion of Mr. Marchand?

   *    *    *    *    *    *

A. The Ann that I was referring to in there was.

Q. It was the same one?

A. (Nodding)

On cross-examination, Roy stated if there was a girl with Big Foot, he had never seen her with Marchand.

Agent Handoga testified with respect to Perkins' photographic identification. He said that Perkins had been asked to identify the two persons who had sold the marijuana, not the two photos that looked "most like" them.

The Government concluded its case with the testimony of Agent Harris as to the note seized from Marchand at the time of his arrest. The defense case was limited to the testimony of Hillman seeking to explain this.

We shall defer to Part IV of this opinion a description of the prosecutor's summation and the charge and of defendant's points about them.

After returning to the courtroom with a request to hear Roy's testimony, the jury brought in a verdict of guilty.

## IV. The Refusal to Suppress the Note Seized on Marchand's Arrest

█ We shall deal first with Marchand's claim that seizure from his person at the time of his arrest of the note relating to Hillman's meeting with Roy violated his rights under the Fourth Amendment since this issue is separable and, if defendant were right, a new trial would be required.[16] If Marchand's arrest was legal, the search of his pants was likewise so. As said in *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973):

A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

However, counsel stoutly contends that the arrest was illegal since it was based on the driver's license which Detective Adcock had obtained in the course of an unlawful search of the wallet that Marchand had left on Higgins' dining room table.

If the arrest stemmed solely from the discovery of Marchand's name on the driver's license, we would be constrained to agree, particularly in light of the decision in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), rendered after this case was argued. But it did not. The trial court found that "Detective Adcock recognized the defendant from having seen his photograph" and that "She also recognized the defendant's name" which she apparently had obtained from the driver's license.[17]

16. Apart from the effect of the note itself in linking Marchand with Roy, it had the practical consequence of compelling the defense to produce Hillman, whose evidence could well have had some adverse effect.

17. In a quite garbled response to defense counsel's assertion that Agent Harris did not know how Detective Adcock identified Marchand, the Agent said, "I would assume from the driver's license that obviously had given the driver's

A preliminary point should be cleared up before we proceed further. In a letter submitted after the argument, defense counsel raised the claim that the photograph to. which the trial judge referred was on the driver's license. The finding is not worded that way and the testimony of Agent Harris was that Detective Adcock "stated she had seen a picture of this person *before.* . . ." (emphasis supplied).[18] Further, there was no evidence that there was a picture on Marchand's driver's license. However, there was evidence, already mentioned, that a photograph had been sent to Detective Adcock, "a specially trained, assigned and experienced officer," *Manson v. Brathwaite, supra,* 432 U.S. at 115, 97 S.Ct. at 2253, and the judge permissibly found that she had seen this before the visit to Higgins' apartment.

We have no doubt that the photograph constituted probable cause for arrest without the reinforcement afforded by the discovery of Marchand's name. Here there was no need for the arresting officers to determine whether there was probable cause to believe that a crime had been committed and that a particular individual had committed it; that role had been performed by the indictment, *Sciortino v. Zampano,* 385 F.2d 132 (2 Cir. 1967), *cert. denied,* 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 872 (1968). All that was required was probable cause to believe that the defendant was the subject of the Vermont indictment. Recognition of a photograph sent by the law enforcement officers from Vermont, supplemented by the discovery of the defendant living in the home of a Florida marijuana dealer, afforded such cause.

We thus face the question whether an arrest that would have been legal if effected on these bases alone became illegal because Detective Adcock improperly extracted Marchand's driver's license from the wallet lying on the dining room table, thereby learning his name and gaining added assurance.[19] While we have found no federal authority squarely on this, we see no significant distinction between the question here presented and that arising where both legally and illegally obtained evidence have been offered to obtain a search warrant.[20] The validity of the warrant was

license, or had been taken, one way or the other. I don't know which way. And was identical, was identified. That's the normal procedure to identify the persons any how." We do not think this confused passage undermines the trial court's finding that Detective Adcock identified Marchand on the basis of his picture as well, since Harris testified that she *stated* she recognized Marchand from the picture, and especially since there was evidence that she had seen a picture and had talked with Agent Handoga about the case.

18. Use of hearsay is not banned on motions to suppress. Federal Rule of Evidence 1101(d)(1); *United States v. Matlock,* 415 U.S. 164, 172–76, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Doubtless in recognition of this, there was no objection to Agent Harris' testifying to what Detective Adcock had said.

19. It is plain that lack of this added assurance would not have prevented discovery of the note. The police clearly had ample basis for detaining Marchand for questioning under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); if he refused to give his name, or gave a false one, either could have led to his arrest and an incidental search of his pants. Alternatively, the police could have detained Marchand while they obtained a warrant and thereby learned Marchand's name, with the same consequences. *See United States v. Falley,* 489 F.2d 33, 41 (2 Cir. 1973) (where broker and importation documents would have been discovered anyway, illegally obtained evidence that shortened or facilitated the investigation "did not supply fruit sufficiently poisonous to be fatal"); *United States v. Cole,* 463 F.2d 163 (2 Cir.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972) ("Conduct is not a legal cause of an event if the event would have occurred without it."). *But see United States v. Ceccolini,* 542 F.2d 136, 140–41 (2 Cir. 1976), *cert. granted,* 431 U.S. 903, 97 S.Ct. 1693, 52 L.Ed.2d 386 (1977) (prosecution did not show by a preponderance of the evidence that witness' testimony would inevitably have been secured absent the illegal search).

20. The Supreme Court of Florida has recently held that "an officer possessing legally obtained information sufficient to constitute probable cause for an arrest is not barred from making an arrest solely because he also has information which was unlawfully obtained." *Sheff v. State,* 329 So.2d 270, 273 (Fla.Sup.Ct.1976). This holding, which relies on the federal cases we discuss below, is precisely on point with the case at bar. We agree with the quoted legal proposition, although the court's conclusion that the original taint did not infect the subsequent observation may be open to debate.

upheld under such circumstances in the leading case of *James v. United States,* 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969). There an officer responded to a report that several men were engaged in mechanical work on a car parked in a public street. When the officer arrived on the scene, he saw the men at work on one of two cars in the street and a third car in a garage, though a man in the garage shut the door quickly on perceiving the officer. When the officer returned four days later, the garage door was open. The new car he had seen there was almost completely stripped. The officer entered the garage and copied down the rear license plate number. A check revealed that the vehicle was stolen, and a search warrant for the garage was obtained. Judge Leventhal found that the action of the man in closing the garage door quickly upon the officer's first visit, and the officer's subsequent observation of a new car completely stripped—valid under the plain view doctrine—provided probable cause for a search of the garage irrespective of the further information gathered during the officer's illegal entry. The court then stated:

> When an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue. *Wong Sun v. United States,* [371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441], in announcing the "fruit of the poisonous tree" doctrine, limited the exclusionary rule to evidence which the police could not trace to some "independent" and lawful source. While the Supreme Court has not specifically had occasion to consider whether this doctrine is applicable to a search warrant that issues on the basis of an affidavit setting forth information both lawfully and unlawfully obtained, other circuits have applied the "independent source" test. If the lawfully obtained information amounts to probable cause and would have justified is-

suance of the warrant, apart from the tainted information, the evidence seized pursuant to the warrant is admitted. 418 F.2d at 1151–52 (footnotes omitted).

This circuit had an early encounter with the problem in *Parts Mfg. Corp. v. Lynch,* 129 F.2d 841 (2 Cir.), *cert. denied,* 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541 (1942). There, certain auto parts alleged to have been stolen from Ford Motor Co. had been ordered returned as illegally seized, *see Weinberg v. United States,* 126 F.2d 1004 (2 Cir. 1942). Before they were returned, FBI agents gave Ford a detailed list of the property seized. Ford replevined the property, which was seized by a New York deputy sheriff and stored in a warehouse. The Assistant U. S. Attorney thereupon visited the warehouse, examined the parts, and subsequently obtained a search warrant, which was executed before Parts Mfg. Co. could retake the goods. It moved that the FBI special agent be required to return the goods because the search was based on information obtained as a result of the illegal first search. Judge Clark found that the Government had sufficient information, independent of any that was obtained illegally, to validate the search warrant. He stated further "Actual examination of the property in the warehouse . . . simply confirmed what affiants already had reasonable cause to believe would be found." *Id.* at 843. Such confirmation did not dictate return of the evidence.

We discussed the taint problem more recently in *United States v. Capra,* 501 F.2d 267 (2 Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975), in the context of a warrantless search. There, the district court upheld such a search of the defendant's car on the grounds that one of the federal agents knew of defendant's prior use of his car for narcotics transactions and therefore had probable cause to believe that the car was carrying contraband. We noted that even if this agent's knowledge of defendant's uses of his car was derived from an illegal wiretap sixteen months before, another agent present at the search

had knowledge of defendant's activities as a narcotics deliveryman that had been legally obtained from an informant, and held that such knowledge was sufficient to sustain a finding of probable cause. *Id.* at 280 n.12.

Other circuits have held squarely that the presence of illegal evidence in affidavits presented for a search warrant does not prevent a finding of probable cause sustainable on other grounds. *See United States v. Sterling,* 369 F.2d 799, 802 (3 Cir. 1966) ("[T]he law is quite clear that the inclusion of illegally obtained evidence does not vitiate a search warrant which is otherwise validly issued upon probable cause reflected in the affidavit and based on proper sources."); *United States v. Tarrant,* 460 F.2d 701, 703–04 (5 Cir. 1972) (where legally obtained information established probable cause, the court need not consider attacks on the legality or sufficiency of other allegations in the affidavits); *United States v. Koonce,* 485 F.2d 374, 379 (8 Cir. 1973) (where affidavit by one officer cited statements of two informants that defendant possessed a stolen boat and indicated the location of the boat from defendant's grand jury testimony, the court need not reach questions raised by search conducted by another officer); *Chin Kay v. United States,* 311 F.2d 317, 321–22 (9 Cir. 1962) (unnecessary to consider attacks on two paragraphs of affidavit since others sufficient to establish probable cause); *Howell v. Cupp,* 427

F.2d 36, 38 (9 Cir. 1970) (officer's finding stolen property in defendant's front seat provided probable cause for warrant to search trunk, not invalidated by previous illegal search of trunk which informed officers of the contents). Insofar as contrary dicta of the Sixth Circuit in *United States v. Langley,* 466 F.2d 27, 35 (1972), and *United States v. Nelson,* 459 F.2d 884, 889 (1972), may not be distinguishable as Mr. Justice Powell has thought them to be, *see United States v. Giordano,* 416 U.S. 505, 556 n.6, 94 S.Ct. 1820, 40 L.Ed.2d 341 (dissenting opinion), we continue to adhere to the majority view.[21]

It is true, of course, that if the sole guiding beacon in a Fourth Amendment case were the maximization of deterrence, all evidence obtained by illegal means in any significant part would have to be suppressed, even though there was a sufficient lawful basis for securing it. But the Supreme Court's decisions on other points of Fourth Amendment law demonstrate that it is not disposed to tilt the balance that far. *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). On the basis of the attitude embodied in such decisions, the precedents here reviewed, and our own belief that a violation of the Fourth Amendment should not

21. It cannot be successfully argued that *Giordano* impliedly disapproved the line of cases discussed above or dictates a contrary result in this case. There, the majority rejected the argument that because an original pen register order was made prior to an illegal wiretap, the two extensions subsequent to the illegal tap could be sustained by the same showing of probable cause as the original order. The Court stated:

The application for the October 22 extension attached the logs of telephone conversations monitored under the October 16 order and asserted that these logs revealed the "continued use of the telephone . . . for conversations regarding illegal trafficking in narcotics." App. 55. In these circumstances, it appears to us that the illegally monitored conversations should be considered a critical element in extending the pen register authority. We have been furnished with nothing to

indicate that the pen register of November 6 should be accorded any different treatment. We think the Court clearly meant that the extension order could not have been granted absent the illegal evidence.

Reference should perhaps be made to cases in this circuit where a tax "saturation investigation" was launched partly from legal and partly from illegal leads. Any implication from language in *United States v. Schipani,* 414 F.2d 1262, 1266 (2 Cir. 1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970), that an indictment stemming from such an investigation should be dismissed—and we doubt whether such an implication was ever justified—has been dissipated by *United States v. Friedland,* 441 F.2d 855 (2 Cir.), *cert. denied,* 404 U.S. 867, 914, 92 S.Ct. 143, 239, 30 L.Ed.2d 111, 188 (1971), and *United States v. Cole,* 463 F.2d 163, 172 (2 Cir.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972).

require exclusion of evidence that was obtainable without it, we uphold the denial of the motion to suppress the note found on Marchand in a search incident to what we consider to have been a lawful arrest.

## V. *Alleged Trial Errors*

(1) *Alleged errors concerning Perkins' pre-trial photographic identification and sketch.*

Appellant mounts a number of attacks relating to Perkins' photographic identification.

■ His first claim is that the array was impermissibly suggestive because "the neutral effect of multiple numbers was totally undercut by the fact that Marchand's picture was the only one which recurred and that of the two large photographs his was the only one of a light-haired man." (Brief, p. 52). The defense also criticizes the nine months delay in presenting the array, and the use of a photograph display rather than a lineup. We are not persuaded by any of these points. The small photograph of Marchand was somewhat marred by glare; also the larger photograph seems to depict him at a later age. *See* fn. 6 *supra.* Indeed, the photographs were sufficiently different to cause Perkins to select only one. Under such circumstances, over-representation of a defendant in the array does not make the procedure impermissibly suggestive, let alone give rise to "a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). In *Simmons,* the Court allowed in-court identifications based on a showing of at least six photos, primarily group photographs, with the defendant appearing several times. *See United States v. Falange,* 426 F.2d 930, 935 (2 Cir.), *cert. denied,* 400 U.S. 906, 91 S.Ct. 149, 27 L.Ed.2d 144 (1970) (inclusion of three photographs of defendant, taken years apart and at different angles, in an array of 16 pictures was not a denial of due process); *United States v. Cunningham,* 423 F.2d 1269, 1271–73 (4 Cir. 1970) (admission of testimony concerning photographic identifications was not imper-

missibly suggestive although seven of 14 photographs were of appellants, and the only color photographs were of appellants and a codefendant).

■ The differences of hair and skin color noted by Marchand were not of great significance since all but three of the pictures were on black and white film. Nor did the differences in size of the pictures cause impermissible suggestiveness. As we have recently said:

> The due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility.

*United States v. Bubar,* 567 F.2d 192, —— (2 Cir. 1977). *See United States v. Magnotti,* 454 F.2d 1140 (2 Cir. 1972) (full-view photograph of defendant in array with seven mug shots did not give rise to impermissible suggestion); *United States v. Harrison,* 460 F.2d 270 (2 Cir.), *cert. denied,* 409 U.S. 862, 93 S.Ct. 152, 34 L.Ed.2d 110 (1972) (that defendant was the only clean-shaven individual in photo array was not such an unnecessarily striking difference as to make him "stand out prominently from the others"). Although the delay was regrettable, it is not decisive, *see United States v. Hurt,* 155 U.S.App.D.C. 217, 476 F.2d 1164, 1168 (1973) (delay of one year); moreover, Agent Handoga testified that he had no photographs of Marchand until late 1975 or early 1976. While it is preferable for law enforcement officers to use a line-up rather than photographic identification when the suspect is available, this is not a requirement. *United States v. Boston,* 508 F.2d 1171, 1176–77 (2 Cir. 1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975).

■ Beyond all this, under *Manson v. Brathwaite, supra,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), decided after this case was argued, even impermissible suggestiveness is not a *per se* bar to the receipt of a photographic identification; the admissibility of this must be determined on

the basis of the totality of the circumstances. Here the first three of the factors noted in *Manson*—the opportunity to view, the degree of attention, and the accuracy of the description weigh in favor of admissibility. Although the two other factors which were relied on in *Manson,* "the witness' level of certainty" and "the time between the crime and the [photographic] confrontation," do not weigh in favor of admissibility, neither are they significant counterweights under the circumstances here presented. The judge was not bound to credit Perkins' expression of uncertainty [22] and there is the unusual fact of the remarkable resemblance between Perkins' sketch, made only a month after the crime, and the photograph later selected by him. There is, further, Perkins' slip of the tongue, which we noted earlier, indicating that Perkins in fact knew Bob Marchand was Big Foot. Moreover, Perkins was under far less pressure to make a photographic identification than the identifying narcotics agent in *Manson, supra, see* 432 U.S. at 118, 97 S.Ct. 2243 (Marshall, J., dissenting); he testified that he felt none.

■ The defense further contends that evidence of Perkins' pre-trial photographic identification and of the making of the sketch was not within Federal Rule of Evidence 801(d)(1)(C) which says that "A statement is not hearsay if . . . the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . (C) one of identification of a person made after perceiving him" since that rule allegedly is limited to corporeal identifications. This argument rests on reading the final words "after perceiving him" as referring to the perception at the time of the identification rather than at the time of the crime and then confining "him" to the defendant's person rather than to representations of it. This is too confining. The

purpose of the rule was to permit the introduction of identifications made by a witness when memory was fresher and there had been less opportunity for influence to be exerted upon him.[23] We thus agree that "Rule 801(d)(1)(C) should . . . be interpreted as allowing evidence of prior identification by the witness of a photograph of the person whom he had initially perceived," 4 Weinstein & Berger, Commentary on Rules of Evidence for the United States Courts and Magistrates 801–107 to 108 (1976), and also to descriptions and sketches.

■ The defendant further contends that the purpose of the Rule to allow introduction of more probative evidence than in-court identifications dictates exclusion of the uncertain and unreliable identifications by Perkins. We have already expressed our views with regard to the certainty of the photographic selection. The objection that the sketch should not have been admitted because of Perkins' later disclaimer of it merits little discussion in view of what we have already said about the remarkable correspondence between it and the photograph and about Perkins' telling slip of the tongue. But even if we felt otherwise with respect to these factual matters, we would not hold that the Rule requires exclusion of this evidence. Protection against identifications of questionable certainty is afforded by the requirement that the declarant be available for cross-examination; questions of the probative value of the testimony are thus for the jury. *See* S.Rep. No. 94–199, 94 Cong., 1 Sess. (1975), *reprinted in* 4 Weinstein & Berger, *supra* at 801–4. *See also id.* at 801–4.6. While the trial judge doubtless has discretion under Rules 102 and 403 to exclude an identification which he considers to have been too flimsy to warrant the jury's consideration, appellate courts should be wary of reversing where the judge has decided that the identifica-

**22.** The trial court did not *find,* as defendant argues, that Perkins' photographic identification was uncertain. The court merely reported Perkins' "concession" on that point.

**23.** As noted at the outset of this opinion, it was fairly inferable that the latter was one plausible explanation of the loss of recollection by the identifying witness Fine in *United States v. De Sisto, supra,* 329 F.2d at 932–34.

tion was sufficiently certain to be appropriate for submission.

Appellant argues that even if the evidence was admissible as substantive evidence under Rule 801(d)(1)(C), it should have been excluded as unreliable on the authority of *United States v. Jenkins,* 496 F.2d 57, 68–70 (2 Cir.), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). But that decision, in a case arising before the effective date of the Federal Rules of Evidence, concerned the different problem when proof of a prior identification (in that case a non-identification of Jenkins and an identification of another) is sought to be proved through a person other than the declarant. See the discussion in 4 Weinstein & Berger, *supra,* 801–108 to 110. While in *Jenkins* we sustained a refusal to allow the third party to testify, we did allow the declarant to testify to his recollection—or more aptly, his lack of recollection—of the photographic identification.

■ Appellant also objects to the court's having instructed the jury that it could "consider" Perkins' photographic identification and sketch without having given the instruction requested by the defendant as to the dangers inherent in eyewitness identification. In *United States v. Fernandez,* 456 F.2d 638, 643–44 (2 Cir. 1972), we said:

> While a defendant is not entitled to a reading of all that was said about the dangers of misidentification in *United States v. Wade,* supra, 388 U.S. [218] at 228–236, 87 S.Ct. at 1926, 18 L.Ed.2d 1149, and *Simmons v. United States,* supra, 390 U.S. [377] at 383–384, 88 S.Ct. at 967, 19 L.Ed.2d 1247, we would think it reasonable that a properly drafted instruction, drawing particularly on Mr. Justice Harlan's language in *Simmons,* should be given if requested. Whether failure to do so would constitute reversible error would depend upon the circumstances.

The reversal in that case rested on other grounds. Defendant has cited no decision holding that the giving of such a charge is mandatory, and a number have refused to do so. *United States v. Evans,* 484 F.2d 1178, 1187–88 (2 Cir. 1973); *United States v. Gentile,* 530 F.2d 461, 469 (2 Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *United States v. Barber,* 442 F.2d 517, 525–26 (3 Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971) (noting "formidable precedential authority" that cautionary instruction is not required). This would be an exceedingly inappropriate case for seeking to make new law on this subject. The identifications were only a part of the case that Marchand was the supplier, a less important part than counsel would have us believe, and the circumstances were such that a cautionary instruction might have led the jury away from the truth rather than toward it.

(2) *Alleged errors concerning Roy's grand jury testimony.*

■ Defendant complains in regard to the Government's summation and the charge with respect to Roy's grand jury testimony. The complaints about the summation relate to statements that Roy "gave sworn testimony under oath to a Grand Jury that identified Bob Marchand as 'Big Foot' or Bob, the supplier" "he told the Grand Jury that this friend committed a felony; that this friend gave him 180 pounds of marijuana"; and he "told . . . the Grand Jury that Bob Marchand was 'Big Foot'." While Roy did not tell the grand jury in so many words that Bob Marchand was Bob or Big Foot, he did testify that the supplier was the Bob, also known as Big Foot (or *vice versa*), who was the same man he had known from Amherst, Mass., days, whom he remet in a Brattleboro bar with a girl named Ann and who had given him telephone numbers to call to purchase marijuana. Roy did in fact testify at trial, without objection, that he led the grand jury to think he could identify Marchand as the person who supplied him with the marijuana and that "this friend" was the man who supplied him with marijuana, which was indeed a felony. The motion for a mistrial was based not on any minor inaccuracies in the prosecutor's statements concerning the grand jury testimony but on

the basis that the testimony could not be used as substantive evidence under Rule 801(d)(1)(A), a point which we reject below.

The charge was as follows:

Now if you find that the witness ROY on that occasion before the Grand Jury, did identify the defendant MARCHAND along with his girl companion ANN CURTIS as the same person as "Big Foot" whom he had previously seen with ANN CURTIS, you may consider his testimony to the Grand Jury as substantive evidence of the facts as he represented them to be in his testimony to the Grand Jury and this is so, although the witness ROY has stated he misled the Grand Jury and was not entirely truthful to that body.

It is for you the Jury to determine in the light of all the evidence in the case bearing on the question which testimony of ROY is true. His testimony at the trial, or his testimony before the Grand Jury in July of 1976.

The objection to this was:

Mr. Weinberg: Our first objection, Your Honor, would be, . . . the first objection, Your Honor, would be to your allowing the Jury to use Mr. Roy's Grand Jury testimony substantively.

We would object both because there was no evidence of an I.D. of MARCHAND in the Grand Jury that came out through the evidence.

Secondly, there were no statements within Rule 801.

Third, because there couldn't have been any introduced because of the taint issue coming from the, your exclusion of the pre-trial photographic identification.

Moreover, I think Your Honor inadvertently invited the Jury to guess which is truthful by asking them to make that kind of decision.

I ask Your Honor to instruct the Jury they can't surmise, conjecture, or guess when Roy told the truth because there wasn't enough evidence to base that kind of judgment on.

The criticisms now made relate to the judge's characterization of Roy's grand jury testimony. These are that the only grand jury statements introduced before the trial jury referred simply to Ann and not to Ann Curtis and that nowhere in the grand jury testimony so introduced did Roy identify Marchand as Big Foot.

The Ann Curtis matter need not detain us. As previously stated, the Government had introduced portions of Roy's grand jury testimony in which he had referred to "Ann" as Big Foot's female associate. Roy admitted that the Ann he referred to before the grand jury was the same Ann who was Marchand's fiancée. The judge could reasonably conclude that Roy's subsequent testimony that he never in fact had seen the girl who was with Big Foot with Bob Marchand did not contradict his statement that the Ann he meant when he purportedly misled the grand jury was Marchand's fiancée. Further, if counsel had thought the reference to "Curtis" to be significant, it was his duty to bring this error to the attention of the judge who would doubtless have corrected it, *United States v. Kahaner,* 317 F.2d 459, 478–79 (2 Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). Counsel could well have thought that doing so would only highlight the point.

With respect to the statement in regard to Marchand, we repeat what we have said about the summation. Grand jury testimony which was read to the jury did have the effect of identifying Marchand as Big Foot, as Roy seemed to recognize in his trial testimony. The judge could well have understood the objection to be that since the trial jury had not heard, and under his suppression ruling should not have heard, evidence of Roy's grand jury photographic identification, no use of Roy's grand jury testimony as substantive evidence was permissible. This simply was not so. Even if Roy's grand jury statements which were read to the trial jury were not admissible under Rule 801(d)(1)(C), they were receivable under Rule 801(d)(1)(A). The flaw underlying much of appellant's argument is the inarticulate premise that identity can be proved only by corporeal or photographic *identification* after the crime. Manifestly

this is not true, as in the case where the person originally observed as the perpetrator has significantly altered his appearance. In such a case and many others, *cf. United States v. Barbati,* 284 F.Supp. 409, 411 (E.D N.Y.1968), identity can be established by other evidence showing how the perpetrator had been known before the crime and then linking the defendant with him; if a witness has testified to such facts before a grand jury and forgets or denies them at trial, his grand jury testimony or any fair representation of it falls squarely within Rule 801(d)(1)(A).

In view of this discussion, little need be said in regard to appellant's further contention that the Government's eliciting from Roy that he had misled the grand jury was a backhanded way of bringing before it the evidence of the photographic identification in violation of the judge's order and Marchand's due process rights. The jury heard nothing about Roy's photographic identification, and the judge evidently did not consider his order to have been violated. The former point suffices to dispose of the constitutional claim as well.[24]

In a footnote to his reply brief Marchand seems to suggest that it was error to allow the Government to ask the questions about misleading the grand jury at all, since Rule 801(d)(1)(A) affords the only way to get inconsistent grand jury testimony of a witness before the trier of the facts. This misconceives the limited function of the Rule, namely, to withdraw the hearsay bar from material coming within it. The Rule does not prohibit the use of other material for impeachment, *see* Rule 613. All that the judge allowed to be considered "as substantive evidence" were portions of the grand jury testimony that were read to the trial jury.

## VI.  *Sufficiency of the Evidence*

■ Although, as indicated, fn.3 *supra,* counsel for appellant argued sufficiency of the evidence as their initial point and included a great deal of discussion of rules of evidence in that argument, we have felt it necessary to deal first with their claims that much of the evidence was improperly received. Having held these to be without merit, we find the question of sufficiency relatively easy.

We start with the solid core of facts as to which there is no real dispute. Bob or Big Foot was the same man all along. He was Roy's friend at Amherst, Mass.; the renewed acquaintance at Brattleboro; the man with whom discussions about marijuana began at Springfield; the man who had a female associate identified before the grand jury as Ann; the man who engaged in two previous narcotics sales to Roy and Perkins; the man who gave Roy telephone numbers which Roy could call to purchase narcotics; and the man who sold the 180 pounds of marijuana on July 18. There were no Bob on the one hand and Big Foot on the other; the two were one and the same. Roy, Perkins or both made frequent calls just before the July 18 transaction to telephones listed in the names of Robert Marchand and Ann Curtis. Roy had meant to implicate Marchand before the grand jury, thought he had done so, and got word to Hillman.[25] Hillman informed Marchand, who made careful note, including Roy's address, *see* fn.11, *supra,* and shortly departed

24. We have serious doubt whether the judge was correct in granting suppression on the ground of impermissible suggestiveness, not only in light of the Supreme Court's recent decision in *Manson v. Brathwaite, supra,* but even apart from it. Roy had made his first photographic identification, such as it was, without impermissible suggestion; the supplying of a better and later photograph of "a Bob" was to see whether this would strengthen recognition already made. The problem lay rather in whether there had in fact been an identification. Marchand's correct constitutional claim

on the "backhanded" argument would thus be rather that he had no opportunity to show the trial jury how slender Roy's photographic identification had been, an opportunity of rather small value in light of Roy's admission to the grand jury that he had identified his supplier. However, since the jury never heard that there was a photographic identification, the issue does not arise.

25. Since this evidence was brought out by the defense, it cannot and does not object on the ground of hearsay.

for Florida. This would justify a reasonable juror in being convinced beyond a reasonable doubt that Robert Marchand was Bob-Big Foot even if there were nothing more.

But there was. Perkins' photographic identification was before the jury. To be sure, Perkins testified that he was asked to select the photograph that "most closely resembled" Bob or Big Foot, and the judge so found despite Agent Handoga's testimony that Perkins was asked to and did make a positive identification;[26] and appellant relies in this connection on such photographic identification cases as *United States v. Keller,* 512 F.2d 182, 184 (3 Cir. 1975) ("a conviction cannot stand when it rests solely on an identification as uncertain as this one"), and *United States v. Johnson,* 427 F.2d 957, 961 (5 Cir. 1970) (where "sole witness is unsure and there are no other connecting or corroborating facts or circumstances" the jury cannot find guilt beyond a reasonable doubt). But these cases dealt with identification by victims who had only scanty opportunity for observation and where there were no corroborating circumstances.[27] There were also Perkins' description and, most important, his sketch. As

we have previously stated, the resemblances between this and the photograph which Perkins later identified are too strong for anyone to believe that Perkins could have drawn the sketch if he had never seen the subject. And Perkins was clear that he had seen the man he was drawing only in connection with the three narcotics transactions, never anywhere else. Despite what the jury could reasonably have deemed a charade about his inability to make a courtroom identification, there was Perkins' inadvertent admission on cross-examination by defense counsel about the sketch that the man standing before him in the courtroom was indeed the man he had tried to draw. Also quite probative was Perkins' selection, tentative though it was, from the scores of phone numbers listed in the toll records, of Marchand's number as the one at which Big Foot could be reached. Finally, there were the various changes of testimony by Roy and Perkins; far from the judge and the jury being bound to swallow the version most favorable to Marchand, they were free to believe, on the basis of self-contradiction and demeanor, that these witnesses were lying[28] when they weakened their earlier statements and that the

26. The jury could reasonably have believed that the emphasis on the "closely resembles" selection was supplied by defense counsel and not by Perkins, and that Perkins picked out the man he thought was Marchand, not someone who resembled him. Perkins testified that he was aware that the task at hand in the photographic identification was to "find the two people I had seen on July 1975." In cross-examination concerning the photographic identification, defense counsel handed Perkins a photograph and the following exchange occurred:

Q. What is it?
A. It was a photograph I picked *to be* the other person that had been with Big Foot.
Q. The person who *most resembled* the person who had been with Big Foot in July of 1975?
Q. Correct. (Emphasis supplied).

Belief by the jury that Perkins selected the man he thought to be Big Foot thus would not be inconsistent with the trial court's finding on the suppression motion that he was *asked* to make a "closely resembles" selection.

27. Defendant also cites a number of cases in which in-court testimony that the defendant resembled the perpetrator of the crime was held insufficient to sustain a conviction, but

these are easily distinguishable. In *Hendrix v. United States,* 327 F.2d 971, 974 (5 Cir. 1964), the only evidence connecting the defendant with the cashing of forged checks was "testimony of a resemblance and the fact that the person sought to be identified was accompanying the persons who are more clearly tied in with the offense charged." In *Alexander v. United States,* 354 F.2d 59, 63–64 (5 Cir. 1965), the only positive identification of the defendant put him at the scene of the bank theft the day before it occurred. The only other admissible evidence was testimony of bank employees that the defendant looked like someone who had been on the premises on the day when the theft occurred. *Id.* at 61. In both *United States v. Musquiz,* 445 F.2d 963, 965–66 (5 Cir. 1971), and *United States v. Luck,* 447 F.2d 1333 (6 Cir. 1971), the only admissible evidence connecting the defendant with the crime was uncertain identification testimony.

28. On one occasion when Roy explained his changed testimony on the basis that he was now testifying under a grant of immunity, the court warned him that the grant did not include perjury or false statements.

former identifications and the grand jury testimony read into the record were the truth. Indeed Roy's brash demeanor comes through even on a cold record. Whatever merit the learned discussions by counsel might have on other facts, they have none here. As in *Achilles v. New England Tree Expert Co.,* 396 F.2d 72 (2 Cir. 1966) (Medina, J.), the verdict was a tribute to Vermont common sense.

■ We have carefully considered defendant's other claims of error but, except for the ones rejected in the margin,[29] find them unworthy of discussion.

The judgment of conviction is affirmed.

## On Petition of Appellant for Rehearing

### PER CURIAM:

Appellant Marchand has filed a petition for rehearing, accompanied by a suggestion for rehearing *en banc.* This is limited to the portion of this court's opinion (Part IV, pp. 991–995) affirming the district court's refusal to suppress the note seized on Marchand's arrest in Florida. We deny the petition.

The basis for our upholding the denial of the suppression motion was that the officers in Florida had probable cause to arrest Marchand which derived from a clearly untainted source, primarily the photograph of Marchand previously sent them from Vermont, quite apart from the additional cause furnished by the unlawful extraction of a driver's license from Marchand's wallet.[1] Not seriously disputing that untainted probable cause existed, Marchand argues that the Government had the burden of showing that the arrest would have been made if the illegally obtained evidence had not existed and that it did not meet this.

■ The argument would transpose to the situation here presented a principle with respect to burden of proof laid down in the usual "fruit of the poisonous tree" case, *e.g., Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Cole,* 463 F.2d 163, 171–74 (2 Cir.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972); *United States v. Falley,* 489 F.2d 33, 40–41 (2 Cir. 1973), and *United States v. Ceccolini,* 542 F.2d 136, 140–41 (2 Cir. 1976), *cert. granted,* 431 U.S.

**29.** Defendant's argument that the indictment should have been dismissed under *United States v. Estepa,* 471 F.2d 1132, 1137·(2 Cir. 1972), is meritless. We there held that dismissal would be required when there is a high probability that the grand jury would not have indicted if presented with first-hand testimony rather than hearsay, or where the prosecution misleads the grand jury as to the "shoddy merchandise they are getting." The complaints here are that instead of calling Perkins before the grand jury the prosecutor had Agent Handoga read Perkins' testimony before the first grand jury which included the statement that he had "found out [Big Foot's] name was Bob Marchand" but not what Perkins later claimed to be the rather weak photographic identification, and added Handoga's own observations with respect to Perkins and Roy's identifications. Perkins' testimony before the first grand jury was clearly hearsay with respect to the second grand jury under the circumstances, and we shall assume *arguendo* that the agent's also was, *cf.* 4 Weinstein and Berger, *supra,* at 801–137 to 140. Assuming that *Estepa* has survived *United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), as we seemingly did in *United States v. Bertolotti,* 529 F.2d 149, 159 (2 Cir. 1974), we do not find either branch of the test to have

been met. There was no deception of the grand jury; *United States v. Harrington,* 490 F.2d 487, 489–90 (2 Cir. 1973); *United States v. Olsen,* 453 F.2d 612, 615 (2 Cir.), *cert. denied sub nom., Leach v. United States,* 406 U.S. 927, 92 S.Ct. 1801, 32 L.Ed.2d 128 (1972), and there is not the slightest doubt that the grand jury would have indicted if Perkins had been called, as he should have been if available.

We likewise reject defendant's argument that the indictment should have been dismissed because it was based in part on Roy's photographic identification which was later ruled to be inadmissible at trial because of impermissible suggestiveness. Apart from our doubt as to the correctness of that ruling, *see* fns. 15, 24 *supra,* the Government, in presenting a case to the grand jury, cannot be expected, save perhaps in the most egregious cases of which this was not one, to anticipate later unfavorable suppression decisions. *See United States v. Calandra, supra,* 414 U.S. at 344–45, 94 S.Ct. 613.

**1.** Although Marchand now avers that Massachusetts and New Hampshire drivers' licenses contained in his wallet at the time of his arrest contained photographs of him, he tendered no evidence of this at the suppression hearing.

903, 97 S.Ct. 1693, 52 L.Ed.2d 386 (1977), where the prosecution, having first obtained tainted evidence, must demonstrate that evidence thereafter developed did not stem from the evidence illegally obtained. Here the sequence was the opposite. When lawfully obtained evidence is sufficient to justify an arrest and an incidental seizure, a defendant suffers no violation of constitutional rights merely because an officer might not have made the arrest but for the additional proof furnished by evidence which he later obtained illegally. The Fourth Amendment protects against an arrest without probable cause derived from evidence legally obtained; it does not confer a further protection against the possibility that a particular officer might not have done what he lawfully could. *Cf. United States v. Capra,* 501 F.2d 267, 280 n.12 (2 Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). The Government thus had no such burden as defendant would place upon it. In the search warrant cases cited in our opinion, the courts did not require the Government to show that the warrant would in fact have issued, or even would have been sought, on the basis of the legally obtained evidence alone; it was enough, in Judge Leventhal's words, "[i]f the lawfully obtained information amounts to probable cause and *would have justified* issuance of the warrant, apart from the tainted information . . . ," *James v. United States,* 135 U.S.App.D.C. 314, 418 F.2d 1150, 1152 (1969) (emphasis supplied). *See also United States v. Koonce,* 485 F.2d 374, 379 (8 Cir. 1973) (if the affidavit of one officer, by itself, "*would be enough to support* a magistrate's finding of probable cause," the illegal search by another officer need not be considered (emphasis supplied)). We see no basis for the challenge by appellant's counsel to the analogy of these cases. The flaw is rather in invoking as an analogy cases where, but for the illegality, the untainted

evidence justifying an arrest might not have been obtained at all.[2]

The petition for rehearing by the panel is denied.

---

**2.** Our "*but see*" citation to *United States v. Ceccolini, supra,* 542 F.2d 136, *see* slip opinion at 992 n.19, does not, as counsel argues, indicate any view on our part that our decision was inconsistent with *Ceccolini.* It quite clearly indicates only that the evidence in *Ceccolini*

dictated a different conclusion whether the Government had met its burden of showing that it would have discovered the untainted evidence without the tainted evidence than in the cases previously cited.