THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ALBERTA GOLWITZER, Defendant.

Supreme Court, Erie County, November 30, 1966.

926

*Michael F. Dillon, District Attorney (Julian F. Kubiniec* and *Sheldon M. Markel* of counsel), for plaintiff. *Benjamin L. Berger* for defendant.

GILBERT H. KING, J.  Defendant was indicted for the crime of first degree manslaughter and preliminary to trial this court conducted a *Huntley* hearing on the question of the voluntariness of certain oral statements made to the police and a statement taken under oath by an Assistant District Attorney before a stenographer.

The defendant, a woman of about 25 years of age, was the mother of three children, one now 5 years of age, another 2 years of age and an infant Bryan who was born December 4, 1965 and whose death on February 3, 1966 resulted in the taking of the defendant's statements and in her subsequent indictment for manslaughter.

The child Bryan died at the home of an aunt of defendant's husband at about 9:30 in the morning of February 3, 1966.  The precinct police were called to the aunt's premises originally on a " rescue " squad call.  The death of the infant caused the intervention of the homicide squad and the Medical Examiner because it was discovered that the child had been confined to a hospital for head injuries from December 31, 1965 to January 19, 1966.

The defendant and her husband, Peter Golwitzer, were contacted by the Buffalo Police Department and asked to go to police headquarters.  The Golwitzers acquiesced in the request and arrived at police headquarters at about 2:00 P.M. where they met Dectective Sergeant Sammon, a member of the homicide squad, who was in charge of the case.

Mr. Golwitzer remained in an outer office with Sergeant Sammon while the defendant was taken into an adjoining room (designated as "the interrogation room" by Sergeant Sammon) by Dectective Sergeant McCarthy. After about 15 minutes Sergeant McCarthy left and Sergeant Sammon entered the interrogation room. Sergeant Sammon testified that he told defendant he was not accusing her of anything and he asked how long it was since the defendant had seen the baby and what the circumstances were which surrounded the head injury of December 31, 1965. The defendant told him that she caught her foot on a chair and she fell and the baby hit the *left* side of its head on a stove handle. The baby was hospitalized with a skull fracture until January 19, 1966 and then returned to defendant's custody until January 24 when it was taken to the aunt's home.

The interrogation continued for about 1½ hours and until Sergeant Sammon received a call from Dr. Creighton, the Medical Examiner, who informed him that the post-mortem examination of the child revealed fractures on both the right and left sides of the head. Sergeant Sammon testified that he was not then advised of the cause of death. He returned to the interrogation room, asked defendant if she knew how the fracture on the right side had occurred, to which she replied in the negative.

He testified that he then advised defendant of her right to counsel and that any statement she made could be used against her. He told her of other similar cases of injuries to infants and was asked by defendant what happened to the others and that he told her they were sent to Matteawan and eventually released and returned to society. He then asked her to tell him the truth, whereupon she made a statement to the effect that she had on two occasions thrown the baby a distance of some six feet into or against a crib. Sergeant Sammon then left the room and advised defendant's husband of her statement. The interrogation up to the time of the statement lasted from about 2:15 to 5:30 when Mr. Markel, an Assistant District Attorney, arrived and started taking the statement before the stenographer. Mr. Markel testified that he advised her of her right to remain silent, that any statement could be used against her and of her right to counsel. Mr. Markel testified that these warnings were given before the stenographer began to take the statement. The transcribed statement however contains only these warnings, "You are under no obligation to give us a statement if you don't want to * * * and you have the right to counsel if you want him to be present when you make it." The defendant was then asked if she was willing to make a statement, asked her husband "You think so?" to which he replied, "A statement

but don't sign it." Defendant was then sworn and the statement taken.

Shortly after the statement was completed a call was received at police headquarters from the pathologist indicating the cause of the death as massive head hemorrhages induced by the skull injuries. The defendant was then held on a manslaughter charge and put in the women's cell. The District Attorney called Dr. Harry Faver, a psychiatrist, who examined the defendant that evening at police headquarters and made a written report.

Sergeant Sammon testified that after the oral statement was made to him and before the statement was taken under oath defendant's husband tried to call an attorney on the telephone and did not reach him, and the defendant then agreed that the statement should be taken without an attorney being present.

It is the People's contention that the defendant was not " in custody " when the statements were taken and that the investigation had not then focused on her. They base this claim on the fact that the exact cause of death did not become known to them until after the statements were taken. They did know, however, that the two other children of defendant had been taken from defendant's custody before this incident occurred and that one of them had suffered several unexplained bone fractures. This information came to them through the Children's Aid Society before the Golwitzers arrived at police headquarters and before any questioning began. They also discovered during the course of the questioning that the defendant had been in the E. J. Meyer Memorial Hospital for 15 days for psychiatric examinations and treatment following injuries to the second child. Sergeant Sammon also testified that he thought the defendant needed psychiatric treatment.

Dr. Faver's report concluded that the defendant had a " marked stenosis and constriction. Actually this stenosis is so severe as to indicate a severe mental illness in the form of a schizo-affective reaction. Because of this interference in her emotions she is unable to respond to the normal emotional expressions and behavior. * * * While she is in superficial contact she is a very sick woman mentally."

It was Dr. Faver's testimony that the defendant talked freely and voluntarily to him. Sergeant Sammon also testified that defendant talked to him freely and voluntarily. Dr. Faver stated that the " constriction " which defendant suffered did not affect her ability to do an affirmative voluntary act such as the making of the statements. He did acknowledge that her calm, unemotional attitude while reciting the abnormal treatment of her child was not the reaction or attitude of a normal person.

In *Miranda* v. *Arizona* (384 U. S. 436, 444) " custodial interrogation " is defined as meaning " questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way " and in a footnote " that is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." Under all of the circumstances of this case with the police possessed of facts about other children of the defendant before the interrogation began, the court holds that this was a " custodial interrogation " and therefore defendant was entitled to all of the protective procedural safeguards set forth in *Miranda*.

To take the safeguards in order as they here apply:

*First,* as to the necessity of the warning that the person has a right to remain silent, I find as a fact that the defendant was warned by both Sergeant Sammon and Mr. Markel of her right to remain silent and I conclude that the People have established beyond a reasonable doubt that her rights in this respect were not violated.

. *Second,* as to a warning that the statement might be used as evidence against her, I find as a fact that both Mr. Markel and Sergeant Sammon gave that warning to defendant and I conclude that the People have established beyond a reasonable doubt that her rights were not violated in this respect.

*Third,* as to the right to have an attorney present, I find that defendant was advised of this right by both Mr. Markel and Sergeant Sammon and I conclude that the People have established beyond a reasonable doubt that her rights were not violated in this respect even though no statement was made to defendant that counsel would be furnished for there was no indication on the part of the defendant of indigency.

*Fourth,* As to whether or not defendant effectively waived any of the foregoing rights I find as a fact:

(1) That the defendant was kept under interrogation for a period of almost four hours.

(2) That she was not subjected to any physical violence or threats.

(3) That her mental condition and background were such that she was unable to voluntarily, knowingly and intelligently waive the right to remain silent, to have counsel and to understand the possible result of the use of her statements against her.

Confessions should not be allowed to be used simply because it is *possible* that the defendant confessed during a period of mental competence where there is a *probability* that the defendant was insane (*Blackburn* v. *Alabama,* 361 U. S. 199). Con-

fessions should not be sought or interrogations continued in any case where it becomes known to the interrogator that the person confessing was " of low mentality " (*Fikes* v. *Alabama*, 352 U. S. 191, 196) or " had a history of emotional instability " (*Spano* v. *New York*, 360 U. S. 315, 322).

In this case there were indications of emotional instability sufficient to give warning to the enforcement officers of the inadvisability of continuing the interrogation and to cast serious doubt on the voluntariness of any statement taken from this defendant.

I conclude that the People have failed to establish beyond a reasonable doubt that the defendant voluntarily, knowingly and willfully waived the right to counsel, or the right to remain silent, or knew the effect of the use of the statement against her.

The court holds that all of the statements of the defendant taken at the Buffalo Police Department on February 3, 1966 were involuntary and may not be used against her.