Reginald S. Oliver, J.
The defendant moves to suppress written and oral confessions made by her to police officers concerning the death of her adoptive child. (CPL 710.20, subd. 3, *1068 and 710.30, subd. 3.) This motion is made prior to an examination of the case by the local criminal court, as authorized by the provisions of CPL 710.50 (subd. 1, par. [b]).
The facts are substantially uncontested. This court must determine whether the statements made by the defendant to the officers were voluntary, with knowledge of her constitutional right's, with a full and complete waiver of such rights and free from coercion.
The defendant was born in Germany. At the age of 16, in 1961, she married a 19-year-old United States soldier stationed there, and they returned to New York upon the completion of his tour of duty. In August of 1962 the defendant became pregnant, but suffered a miscarriage thereafter. There were no further pregnancies. The couple adopted a male child in 1968, and a female child was later placed with them for adoption. This infant girl fell from a vanity or bureau and sustained injuries from which she died. A few months later in 1970 a second infant girl was placed with the defendant and her husband for adoption.
The second infant girl suffered injuries on the morning of December 13, 1971. She was hospitalized and died at approximately 2:10 p.m. the following day from brain damage and other causes. On December 14th, the defendant spent a sleepless night, in spite of medication, and was resting on the 15th of December when two plainclothes investigators arrived at her home at approximately 2:00 p.m:. Investigator William J. Aikins testified that upon arriving at defendant’s home, she was advised fully as to the warnings required by Miranda and defendant said she understood. After questioning concerning injuries to the child, the defendant and her husband agreed to submit to a polygraph test and accompanied the investigators to State Police Headquarters at Canandaigua. The defendant was driven in a car by one investigator and her husband and infant son followed in another car operated by the other investigator.
They arrived at Troop E Headquarters at approximately 3:00 p.m. where she was taken to Investigator Lawrence C. Scott, a polygraph expert. The defendant and Investigator Scott were alone in the polygraph room from that time until approximately 5:30 p.m., except when Investigator Scott left the room for two short intervals. The defendant saw no one else during this period of time, nor did she speak to anyone else or leave the room. The polygraph testing room is approximately 10 feet by 10 feet, with a table, chairs, a radiator, and the testing *1069 machine. A window opens out onto a rear lawn adjacent to the wing of the building. The door was kept closed to the room, with a sign in the hallway by the door cautioning for quiet because a polygraph test was in progress.
Investigator Scott showed her a pink plastic model of the human heart, advised her again of her Miranda rights, he was told that she understood, and he gave her the July-August, 1969 issue (Vol. IV, no. 1) of The Journal of Polygraph Studies, published by the National Training Center of Lie Detection, Inc., and asked her to read it. He left the defendant alone in the polygraph questioning room and returned some 15 minutes later. He was told by the defendant that she had read the four-page journal pertaining to polygraph examinations.
The purpose of the article was ‘ ‘ to answer questions about the polygraph ”. Nineteen separate “questions” are numbered and printed in bold capital letters; each question is answered in a few sentences, e.g., explaining the operation of the instrument, the duties of the operator and the general application of polygraph tests.
Question 9 is: “ will i know beforehand what the test questions will be?” This is answered in the affirmative. There is no proof that this defendant was told before questioning began what the questions would be.
Question 15 is: “ why isn’t the polygraph allowed in criminal trials? ’?
The answer is: “ The results of the polygraph examinations are allowed as testimony in a criminal court, if certain conditions are met. Naturally, the first condition is that the polygraphist who testifies be an expert in his field.
“ The next general legal rule is that in a criminal trial the examination results are allowed when a specific agreement has been reached by the defendant, his attorney and the prosecuting attorney to have the test results introduced into evidence.”
Question 16 is: “if the examination results are allowed in COURT, DOES IT MEAN THEY ARE INFALLIBLE? ”
“ No, it does not. For example, as was previously mentioned, excessive twitching of the arm containing the pressure cuff will result in either the examination being ‘ inconclusive ’ or even possibly a report of truthfulness on a person who is really lying. Infallibility has never been found in any science, and especially those which deal with human beings.
1 ‘ Most examinations readily reveal to the polygraphist whether the person is truthful or not truthful. However when there is the slightest reason to doubt the validity of the test *1070 results, the polygraphist requests a reexamination or he reports the test as ‘ inconclusive
‘ ‘ ‘ Inconclusive ’ means the examiner is unable to render a report of truthfulness in that particular case. In layman’s terms, he is saying ‘ I don’t know whether or not this person is telling the truth ’. ’ ’ (Italics added.)
Alter reading the pamphlet she was then advised of her rights under Miranda by Investigator Scott, and shown a pale red plastic heart. The investigator explained to the defendant the physical reaction of the heart during the test if her answers were not truthful. The plastic heart remained in view on the radiator throughout the course of the test, which lasted, according to Investigator Scott, from approximately 3:30 in the afternoon until the defendant was returned to the other investigators about 5:30.
At the conclusion of the polygraph test Investigator Scott left the room, and returned shortly and told the defendant she had been lying. Scott admitted he told the defendant at least three times, and possibly more, that she had not told the truth. Shortly thereafter the defendant explained the manner in which the child had been injured. Investigators Haring and Aikins spent nearly another hour in obtaining a written statement from the defendant.
-• It is undisputed that the defendant was advised of her rights under. Miranda several times. The testimony shows that she stated she understood the warnings, and once stated she did not need a lawyer at that time. There is, however, no proof of a waiver of those rights, other than the defendant’s acknowledgment that she understood, or that she did not at that time want an attorney. There is a vast difference between merely -understanding one’s rights on the one hand, and voluntarily and knowingly waiving the protection afforded them on the other. If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived her privilege against self incrimination and her right to counsel or appointed counsel. (Miranda v. Arizona, 384 U. S. 436, at p. 475.)
It is also undisputed that defendant was obviously emotionally upset. Her manner and appearance were testified to by friends who saw her on the 14th of December. She was crying, had little facial expression, eyes were glassed over, “ just sitting ”. Investigator Scott testified that he would not characterize the defendant as “ emotionless ” during his interview with her.
*1071 The defendant was examined by Dr. William Libertson, a qualified forensic psychiatrist, on December 16, 1971 at the Wayne County Jail for a period of two and one-half hours. He termed the meeting an “ extensive interview ”, and related the pertinent material he obtained from the defendant for the purpose of his diagnosis. He was endeavoring to determine if the statements made by the defendant were given voluntarily and intelligently.
Doctor Libertson concluded that at the time of defendant’s questioning at police headquarters on December 15th she was frightened, suggestible, somewhat withdrawn, sad, bewildered, confused, emotionally unstable, and perplexed. It was his opinion that the statement given by the defendant in the atmosphere described was coerced by external forces and her internal mental condition. Furthermore, in the expert’s opinion she could not knowingly and intelligently waive her constitutional rights; she could not defend herself against the coercive forces and bring to bear a knowing, intelligent waiver. On cross-examination, the doctor testified that she was not possessed of a free and voluntary state of mind, and was not in conscious control of herself at the time the statement was taken. He had no doubt that the defendant was not able to protect herself. He testified further on redirect examination that the defendant’s self determination was impaired, in a police-dominated atmosphere, she was cut off from the outside world, compelled to answer questions, and had no touch of reality. In such a case, he stated, there could be no intentional abandonment of her rights. Being foreign born, he stated, would have bearing on her lack of knowledge and was taken into consideration by him in arriving at his conclusions.
The People produced Dr. Michael J. Lynch, also a qualified forensic psychiatrist, who had examined the defendant on January 31, 1972. He had substantially the same facts on which to base his opinion as did Dr. Libertson, and did not believe the difference in time elapsed between the examinations would affect his opinion. Dr. Lynch stated that the defendant was able to give a free and voluntary statement and to understand and comprehend her rights. Further, that although the defendant was under gross emotional stress on the afternoon of December 15th, she was able to make the decision to give a statement to the police, even if the decision was, in his word, ‘ ‘ injudicious ’ ’.
There is a reasonable doubt, supported by the testimony of Dr. Libertson, that the defendant did knowingly, intelligently and voluntarily waive her rights under Miranda (supra), and *1072 the court so finds. However, the court will not rely solely on such a finding to render the statements and confession of the defendant inadmissible against her. Comment is necessary with regard to the method of interrogation used in this case, with specific reference to the use of the polygraph test.
At the conclusion of the test, Investigator Scott gathered the graph sheets and left the room. He had told the defendant he would be able to tell if she had been lying. Upon his return to the room, he told the defendant that it was his opinion that she was lying. He told her not once, but two or three, or possibly more, times, that she was lying. Following the investigator’s insistence that she had not told the truth, the defendant made an oral statement which was later reduced to writing by Investigators Aikins and Haring.
A confession must be voluntarily rendered, by a reliable and clear-cut determination. Its admissibility is a question for the court to decide. (Lego v. Twomey,-U. S.-, 40 U. S. Law Week 4135 [Jan. 12, 1972].)
In New York, the People have the burden of proving beyond a reasonable doubt the voluntariness of a confession. (People v. D’Iorio, 49 Misc 2d 30.) Where there is a question of the mental or emotional condition of a defendant, custodial interrogation for four hours has been held to render a defendant incapable of voluntarily, knowingly and intelligently waiving his constitutional rights. If there is a possibility that the defendant was incapacitated, any confession is not admissible. The People have the burden of proving the admissibility of a confession beyond a reasonable doubt. (People v. Golwitzer, 52 Misc 2d 925.) The facts in Golwitzer are nearly the same as in the instant case. A defendant must make an express statement waiving his rights under the Constitution. (People v. Anonymous, 58 Misc 2d 13.) The question of waiver is one to be determined by the trial court. It must be found that the defendant is in touch -with reality, is competent and able to understand the meaning of his statements. (People v. Bank, 63 Misc 2d 645.)
The test of admissibility of a polygraph examination was set forth in People v. Forte (279 N. Y. 204 [1938]). The Court of Appeals there held that it would not take judicial notice whether a lie detector is or is not effective. Lacking a showing of general scientific recognition, it was held not to be error to refuse the defendant to experiment with it.
*1073 The Court of Appeals again faced the same question in People v. Leone (25 N Y 2d 511 [1969]). It refused to allow the admissibility of a polygraph test, because it was not adequately established that such test was reliable. The court followed People v. Forte as to the necessary test, i.e., general scientific recognition.
Mrs. Zimmer took the polygraph test voluntarily. There is some indication she thought she could 1 ‘ beat ’ ’ the machine. At the conclusion of the test she was told several times by her interviewer that she was lying. She had read that the results of the test could be used in court against her and that if there were any possibility of error in the results of the test, the operator would request another test or report the test as inconclusive. She was alone, bewildered, with no one to advise her what to do next, except Investigator Scott insisting she had lied. The interview with Investigator Scott lasted nearly three hours. The defendant had, in effect, been under police control for over three hours.
The court finds that under all the circumstances set forth, the statement made by the defendant was not her free, voluntary act. In her emotional condition, she was as surely coerced into the confession by the use of the polygraph test as if she had been forced by some other means to give the police officers the statement they were seeking. She had no freedom. For all she knew, the examination could be used against her to show she had been lying. She was not told that such results could not be used against her on trial under any circumstances. (See Matter of Sowa v. Looney, 23 N Y 2d 329, at pp. 333-334 [1968].)
A confession, admission or other statement is involuntarily made by a defendant when it is obtained by use of force, improper conduct or undue pressure, which impairs the defendant’s physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement, or in violation of such rights as the defendant may derive from the Constitution of this State or of the United States. Any such statement may not be received against the defendant in a criminal proceeding (GPL 60.45).
The modern practice of in-custody interrogation is psychologically rather than physically oriented. A waiver of the accused’s rights, at the time of custodial interrogation, which is the product of psychological pressure or coercion will render any statement made thereafter inadmissible in evidence. Under such circumstances, the will of the accused is overborne, and his waiver decision is not the exercise of a voluntary choice. *1074 (Miranda v. Arizona, supra, pp. 448-449; 457-458; 476-477.) Psychological coercion may be any method or technique which is intended to, or may, play directly or itidirectly upon the defendant, so as to instill in him a sense of fear, foreboding, insecurity, or other feeling which will induce, motivate or compel him to waive his rights and respond to questions posed by law enforcement officers. Psychological coercion, while difficult to assess, is a direct threat brought to bear by a sophisticated type of pressure. Under Miranda, any attempted or real psychological coercion is enough to taint the voluntariness of the confession. (See 19 Proof of Pacts [Am. Jur.], pp. 42-76.)
It is the decision of the court, on all the evidence herein, that the People have failed to sustain the burden of proving beyond a reasonable doubt that the statement made by the defendant Zimmer was given freely, voluntarily and intelligently. The defendant’s rights against self incrimination were not adequately protected.
The motion to suppress is granted. All statements by the defendant and the confession must be excluded in the criminal action pending against the defendant.
The opinion herein contains the court’s findings of fact and conclusions of law as required by GPL 710.60 (subd. 6).