UNITED STATES of America, Appellee,

v.

**Arnold B. MOSKOWITZ, Defendant-Appellant.**

**No. 652, Docket 77–1417.**

United States Court of Appeals, Second Circuit.

Argued Feb. 21, 1978.

Decided June 29, 1978.

Certiorari Denied Oct. 2, 1978. See 99 S.Ct. 204.

Jonathan J. Silbermann, The Legal Aid Society, Federal Defender Services Unit, New York City (Martin Erdmann, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for defendant-appellant.

Barry E. Schulman, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (David G. Trager, U. S. Atty., Harvey M. Stone, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before FRIENDLY, MULLIGAN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Appellant, Arnold B. Moskowitz, was found guilty of armed bank robbery, 18 U.S.C. §§ 2113(a) and (d), after a six-day jury trial in the United States District Court for the Eastern District of New York, Ellsworth A. Van Graafeiland, Circuit Judge, sitting by designation. On this appeal from his judgment of conviction, appellant does not challenge the sufficiency of the evidence; instead, he argues that the trial judge erred in failing to suppress an in-court identification by one of the bank employees and in admitting a police sketch of the bank robber.

Both the government's case and the defense were relatively simple. The principal issue was one of identification. The bulk of the government's case consisted of testimony by three bank employees who had had ample opportunity to observe the bank robber and who positively identified the appellant. Appellant's alibi defense was that he had been at home, in bed, asleep at the time of the robbery. Appellant testified that he had slept late on the day of the robbery. This was supported, circumstantially, by the observations of his parents and two sisters. One bank employee, who had known the appellant as a bank customer prior to the robbery, and who had observed the robber briefly, testified that the appellant was not the robber.

## FACTS

The robbery of the Chemical Bank at 2730 Coney Island Avenue in Brooklyn began at approximately 8:45 a. m. on Thursday, June 3, 1976, when bank manager Michael Gleason arrived for work and parked his car in the bank's rear parking lot. As Gleason got out of his car, he heard someone call him by his first name. He turned and saw the bank robber, whom he later identified as the appellant, sitting alone in a red Ford Torino parked nearby. The robber asked, "don't you recognize me?" Although Gleason could see his face clearly, he replied that he did not know him. Gleason moved closer to the robber, who asked a second time, "are you sure you don't recognize me?" Gleason again said he did not. He moved closer, and the robber told him to take a closer look and asked, "you're sure you don't recognize me?" By this time Gleason had reached the robber's car, and he said again that he did not recognize the robber. Then the robber lowered a copy of the Daily News to reveal a black .38 caliber revolver which was pointed at Gleason. He instructed Gleason to walk around the front

of the car and sit in the passenger seat. Gleason complied, and the robber told him that "they" were calm professionals who were going to rob the bank and who would bomb Gleason's home—the correct address of which was mentioned—if he did anything wrong. The robber then displayed a hand grenade and said that if Gleason did anything wrong once inside the bank he would throw it at the other bank employees. Gleason recognized the grenade, for he had taught the throwing of hand grenades while in the service. The robber also displayed a walkie-talkie, which he turned on long enough for Gleason to hear what sounded like official communications; "they" would be monitoring police calls, Gleason was told. The robber also mentioned that the police were slow to respond to calls originating in the bank's precinct.

At 8:55 a. m., the robber announced that it was time to enter the bank. Before the two got out of the car, another individual walked into view from around a corner of the bank. The robber said that this individual was with him and that yet another accomplice was covering the bank's front door. Gleason used his key to open the back door of the bank, which he was told to leave open, and the robber followed Gleason into the bank. When they reached the main area of the bank, the robber stood behind one of several large panels which were being used to display an art exhibit. As instructed by the robber, Gleason called to Joyce Pyle, the bank's assistant manager, and to Frances Criscione, the chief clerk, and told them to join him. The three bank employees entered the bank's main vault, followed by the robber. Gleason told Pyle and Criscione, "Don't do anything foolish, I don't want anybody hurt, we are being robbed." In order to open the vault, Gleason and Criscione had to set separate combination locks, which they accomplished after a few initial mistakes. Criscione was spurred along by the robber's mention of the neighborhood in which she lived. The robber, who had previously told Gleason that he knew the vault contained a lot of money, said he wanted "the bags." This was a reference to two large bags containing a total of $270,000 which had been prepared the previous evening for shipment by armored carrier to the Federal Reserve. Gleason slid the bags toward the robber, who picked them up and fled out the open back door and, apparently, into the waiting red Ford. Pyle then turned in the alarm and called the authorities. As far as the record discloses, neither the car, the gun, the grenade, the walkie-talkie, the bags, the accomplices nor the money has yet been found.

Gleason, Criscione and Pyle each testified unequivocally that appellant was the person who had robbed the bank. The rest of the government's evidence was susceptible of conflicting inferences. Appellant had been an auxiliary policeman, and from this the government urged the jury to infer that appellant possessed the robber's familiarity with police radios and practices. Appellant, on the other hand, argued that this evidence showed that he was an individual who respected the law. He pointed out that familiarity with police radios is common and that radios capable of monitoring police broadcasts are widely available. The government also presented evidence of flight. On the afternoon prior to the robbery, appellant had made a one-way reservation on a National Airlines flight to Florida. He had flown to Florida on the afternoon of the day of the robbery, spent about one week traveling around Florida in a rented car, and then returned to New York in a car he had obtained from a car transportation agency. The government argued that this showed appellant's consciousness of guilt. The jury was asked to infer that appellant had kept on the move, returning home only when he was confident that the coast was clear. As is often the case with evidence of flight, an innocent inference was also available. The appellant explained that about the time of the robbery he had just left a job at a gas station and was about to begin work for Senator James Buckley's reelection campaign and his trip to Florida had been a long-planned vacation before beginning the new job. Several witnesses supported this explanation. Finally,

the government sought to prove that appellant, who had been a customer of the bank for some time, and who, in the six months prior to the robbery, had entered the bank an average of four times a month to make deposits, did not enter the bank at all during the period between the robbery on June 3 and his arrest on August 12, 1976. The government argued that this too showed consciousness of guilt. Appellant's explanation for this was that after he began work on the Buckley campaign it was more convenient to bank at a Chemical branch near his job in Manhattan.

The defense presented several witnesses. The first was Kenneth McGuinness, who had been an officer assistant at the bank. He testified that when he arrived for work on the morning of the robbery he had noticed someone sitting in the red Ford reading a newspaper. Later, in the bank, he had heard Gleason call out to Criscione and Pyle, and he had seen the robber for 5 or 10 seconds, from a distance of 30 feet, as the robber entered and then exited the vault area. McGuinness had known appellant as a customer of the bank, and he said that appellant was not the robber. On cross-examination, he admitted that he had told the prosecutor and defense counsel that he was not "one hundred percent sure" or "positive" that appellant was not the robber. He also testified that he had not seen the robber carrying any money bags, although at the time of trial he remembered having seen some object in the robber's left hand as he left the bank.

Other defense witnesses included appellant's supervisor on the Buckley campaign staff and his former employer, the manager of a gas station near the bank and appellant's home. Each testified that appellant had planned to take a vacation in Florida. The gas station manager testified that he had cashed pay checks for appellant after the robbery and that appellant had gone to get change for him after the robbery, which he had done on many occasions prior to the robbery. He did not know whether appellant had obtained the change at the bank, as he had in the past, or elsewhere. Another witness, a long-time friend of appellant's,

testified that he, appellant and two other friends had gone to Roosevelt Raceway on the evening of May 29, 1976, and the appellant had won about $1,000 betting on horseraces. This evidence was apparently intended to demonstrate that appellant could afford a Florida vacation without relying on the proceeds of a bank robbery. However, this story was used to greater advantage by the government than by the defense, for it suggested several inconsistencies in the appellant's defense and raised questions which the defense was apparently never able to answer satisfactorily. For example, on cross-examination, the prosecutor asked appellant to specify the various uses to which the alleged $1,000 winnings had been put. Appellant listed a $100 savings deposit, a $200 purchase of traveller's checks, $200 in cash expenses in Florida, the payment of a debt of $100 and the purchase of clothing for perhaps $50. Of the remaining $350, he testified that he had put at least $200 in a metal box at home. He had testified on direct examination that he kept "a lot of money" in this box, and on cross-examination he said that around the time of the robbery it contained about $1,000 in cash. This undermined his testimony that he was a "thrifty" individual who liked to keep his money in a savings account earning interest. It also raised questions about his motives for making a $5.00 deposit in his savings account at another bank on the afternoon of the robbery, while leaving a large amount of cash at home.

Appellant's parents and two sisters also testified. They said it was the custom and habit among members of the household for the last person in at night to lock the doors from the inside with a chain. Appellant had been the last person in the house on the night of June 2nd. Appellant's father had awoken first on the morning of the 3rd, and he had found both the front and rear doors of the house locked. He had also found the door to appellant's room closed, as it generally was when appellant was inside. One of appellant's sisters also said she had seen appellant's door closed, and both sisters said they had not seen him on the morning of

June 3rd. Appellant's mother testified that he had emerged from his room between 11:30 and noon.

Appellant testified in his own behalf. He denied robbing the bank, and he said he had slept until almost noon on June 3rd. He testified about his work for the auxiliary police, for the gas station and for political campaigns, and he described his vacation in Florida. He admitted that he had stopped using the bank regularly after the robbery, but he claimed to have visited the bank on two or three occasions after the robbery. First, he said he had gone to the bank on the afternoon of the day of the robbery to make a $5.00 deposit, but he had found the bank's waiting line too long and had instead made the deposit in his savings bank. Second, he said that after his return from Florida he had gone to get change at the bank, perhaps twice, for his former employer at the gas station.

The testimony of Gleason, Criscione and Pyle was squarely inconsistent with that of McGuinness and appellant. The jury, by its verdict, obviously accepted the former and rejected the latter. Most of the other evidence in the case was either inconclusive or open to both incriminating and innocent interpretations. The jury apparently found that the government's interpretations rang true, and it chose not to draw the inferences argued by the defense.

## DISCUSSION

The first issue appellant raises on this appeal is whether the failure of the trial judge to suppress Pyle's in-court identification testimony requires reversal. Pyle had been involved in a series of pre-trial identification procedures. On the day after the robbery, she participated in the making of a police drawing of the robber. This drawing, about which we say more below, bears a striking resemblance to appellant. Six days after the robbery, on June 9th, Pyle was shown a photo spread, and she selected a photograph of appellant as the individual whom she felt was the robber. Two weeks later she was shown a second photo spread, which included a different picture of appel-

lant, but this time she was unable to identify the robber. A line-up was held on August 12, 1976, which Gleason, Criscione and Pyle attended separately. Gleason and Criscione identified appellant, but Pyle identified an FBI clerk as the robber. Pyle was subsequently informed, either by the Assistant United States Attorney or by one of the FBI agents, that she had picked the wrong man and that Gleason and Criscione had picked the right one. She was not told which man Gleason and Criscione had selected. She was then shown photographs of the participants in the line-up. No one suggested whom to pick from among the photographs. This time she identified the appellant as the robber. She explained that at the line-up viewing conditions had been poor. The line-up was viewed through what Pyle described as a "slit in the door," which made viewing to either side difficult. Gleason had also complained about the poor conditions, and he had been allowed to move from behind the door to view the line-up directly. Pyle testified that, although she had seen two individuals at the line-up who looked like the robber, she did not want to leave without picking someone, and so she picked the one whom she could see the best, namely, the one who was most directly in front of her.

In *United States v. Jarvis*, 560 F.2d 494 (2d Cir. 1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978), this Court disapproved of the practice of telling potential witnesses of the "correctness" or "incorrectness" of pre-trial identifications. The Court said that "[s]uch practices might well so taint an identification as to require reversal." *Id.* at 500. *See, e. g., United States v. Russell*, 532 F.2d 1063, 1068 (6th Cir. 1976). Appellant argues that his case falls within the class of cases referred to in *Jarvis* where reversal is required.

The appropriate standard to be applied in this case is well-established. In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court held that

convictions based on eyewitness identification at trial following a pretrial identi-

fication by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* at 384, 88 S.Ct. at 971. Whether the practice of telling potential witnesses of the correctness or incorrectness of pre-trial identifications has created "a very substantial likelihood of irreparable misidentification" depends on how it is done. In both *Jarvis* and *Russell*, the witnesses' initial identifications may have been induced in part by statements by government agents that a particular individual was the "right" or the "wrong" or the suspected person. However, the danger of "irreparable misidentification" is greater in cases where the witness is told that the "right" person or the suspect has been selected, than in cases, such as this one, where the witness is told that the "wrong" person has been selected. In the former situation, the witness' belief may be improperly reinforced by the confirmatory remarks of the agents. This reduces the trustworthiness of any subsequent in-court identification because it increases the possibility that the witness will "retain in his memory the image of the [person selected] rather than of the person actually seen." *Simmons v. United States, supra,* 390 U.S. at 383–84, 88 S.Ct. at 971. The latter situation, while suggestive, is far less likely to produce an "irreparable misidentification" because it merely narrows the field from which the witness will make a second selection, and it does not involve any improper reinforcement or confirmation of the second selection itself.

■ We recognize that there may be situations where a statement that a particular selection is "wrong" will impermissibly narrow the field of choices. Where the field is particularly narrow to begin with, or where the field has been narrowed by other factors, a statement that one person is "wrong" may be the functional equivalent of a statement that another is "right." This is not such a case, however. Here, the government simply told Pyle that she had chosen an FBI clerk. This narrowed the

line-up field from the original six to five. At the original line-up, suggestive procedures played no part in leading Pyle to feel that the line-up included a second individual who might have been the robber. Indeed, poor viewing conditions appear to have been responsible for shifting attention from appellant to the FBI clerk. Subsequently, when viewing conditions were equalized through the use of a photo spread made up of cut-out pictures from the original line-up, suggestive procedures played no part in appellant's second selection, and no one reinforced the selection by confirming that appellant was the "right" choice or was the suspect or had been selected by other witnesses.

■ Pyle had had an excellent opportunity to observe the robber in the bank on the day of the robbery. The next day she participated in the making of a drawing that is a very good likeness of appellant. Less than a week after the robbery she selected appellant's picture from a photo spread. She was certain of her in-court identification. That she was unable to recognize the robber in a second photo spread and that she selected an FBI clerk at the line-up affected the weight to be given her testimony and were matters properly left for consideration by the jury. Under all the circumstances, we hold that Pyle's viewing of the photographs of the six members of the line-up knowing that the individual she had previously identified was an FBI clerk and that Gleason and Criscione had selected the "correct" individual from the remaining five, was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *See also Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

Appellant's second argument is that the trial judge should have excluded the sketch made by a police artist on the day after the robbery. The sketch was made based on descriptions given by Pyle and Gleason, so that the finished product was, in Judge Van Graafeiland's words, "their handiwork." It is appellant's position that the sketch was

admitted in violation of the rule against hearsay.

Rule 801(d)(1)(C) of the Federal Rules of Evidence provides that "A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person made after perceiving him." In *United States v. Marchand*, 564 F.2d 983, 996 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), we held that

> "Rule 801(d)(1)(C) should . . . be interpreted as allowing evidence of prior identification by the witness of a photograph of the person whom he had initially perceived," 4 Weinstein & Berger, Commentary on Rules of Evidence for the United States Courts and Magistrates 801–107 to 108 (1976), and also to descriptions and sketches.

Appellant seeks to avoid our decision in *Marchand* by arguing that the sketch is not a "statement." This argument does not advance his cause, however.

■ Under Rule 801(d)(1)(C), as interpreted in *Marchand*, the testimony of Pyle and Gleason that they had previously said the sketch looked like the robber was properly admitted. The sketch itself was relevant, and therefore admissible under Rule 402, because it was the likeness that Pyle and Gleason identified. We agree with appellant that the sketch is not a "statement" under the definition in Rule 801(a), which provides that, "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." For that same reason, however, it is not "hearsay" under the definition in Rule 801(c)—which defines "hearsay" as "a statement"—and the rule against hearsay provides no basis for its exclusion. Appellant's argument is premised on the incorrect assumption that the sketch is admissible, if at all, only under Rule 801(d)(1)(C), and that a condition of admissibility under Rule 801(d)(1)(C) is that it be a "statement." This reasoning fails to recognize that Rule 801(d)(1)(C) is in the na-

ture of an exception to the rule against hearsay, and so it need not be considered unless the evidence in question would otherwise be hearsay. The sketch itself, as distinguished from Pyle's and Gleason's statements about it, need not fit an exception to the rule against hearsay because it is not a "statement" and therefore can no more be "hearsay" than a photograph identified by a witness.

■ Appellant also seeks to distinguish *Marchand* on the ground that in that case the sketch was made by the witness, rather than by a police artist. Appellant's theory is that the sketch, if a "statement" at all, is a "statement" by the artist, who, under Rule 801(d)(1)(C), must testify at trial and be available for cross-examination. This theory is also flawed by the assumption that the sketch must satisfy the requirements of Rule 801(d)(1)(C). The statements of Pyle and Gleason, to the effect that the sketch looks like the robber, met the rule's requirements. Both witnesses testified at trial and were subject to cross-examination. The sketch itself was not admitted as a "statement" by the artist; it was admitted to show the likeness that Pyle and Gleason had identified. Therefore, the sketch did not have to satisfy the requirements of Rule 801(d)(1)(C); it merely had to satisfy the authentication requirements of Rule 901, which it did. The sketch was authenticated by extensive testimony that the sketch introduced at trial was the same sketch identified by the witnesses. The testimony of the artist was no more necessary as a condition of admissibility than a photographer's testimony would have been had the witnesses identified a photograph.

■ Our view that the sketch was not a "statement" creates no danger that the sketch would be admitted without the defense's having an opportunity to cross-examine the witness who identified it. The sketch is irrelevant until there has been evidence that it was the subject of a prior identification made by a witness. Under Rule 801(d)(1)(C), evidence of a prior identification is admissible only if the witness testifies at trial. Thus, unless the witness

testifies, the sketch remains irrelevant and therefore inadmissible.

■ Finally, there is no merit to the contention that the sketch was admitted in violation of Rule 801(d)(1)(B), which allows prior consistent statements of a witness when "offered to rebut an express or implied charge against him of recent fabrication . . . ." Again, the sketch was not admitted as a statement, it was admitted, after a proper foundation had been laid, because relevant and admissible statements were made about it.

The judgment of conviction is affirmed.

FRIENDLY, Circuit Judge, concurring:

In my view it would be a more straightforward analysis to regard the sketch as an integral part of Pyle's and Gleason's statements to the police artist which enabled him to draw it and of their statements of satisfaction with his work, and to hold that it was thus admissible under Rule 801(d)(1)(C). However, in view of Judge Meskill's recognition that the sketch would be "irrelevant and therefore inadmissible" unless the identifying witness testifies, the result of the differing approaches is here the same.