# State of Vermont v. Richard Smith a/k/a Kevin West

[437 A.2d 1093]

No. 81-80

Present: Barney, C.J., Larrow, Billings, Hill and Underwood, JJ.

Opinion Filed September 22, 1981

Motion for Reargument Denied October 29, 1981

Appeal from convictions for rape and murder. Washington Superior Court, *Hayes*, J., presiding. *Affirmed.*

*Michael J. Sheehan,* Windsor County State's Attorney, White River Junction, for Plaintiff.

*Valsangiacomo & Detora, P.C.,* Barre, for Defendant.

**Hill, J.** Defendant appeals a conviction for rape of a sixteen-year-old woman under 13 V.S.A. § 3201 (1974),[1] and murder of an eight-year-old child under 13 V.S.A. § 2301. He was sentenced to life imprisonment for murder in the first degree and for a period not to exceed twenty years in connection with his conviction for the offense of rape. We review this case for a second time, an earlier conviction having been reversed on grounds that the lower court improperly curtailed evidence directed toward establishing an insanity defense. *State* v. *Smith,* 136 Vt. 520, 525, 396 A.2d 126, 128 (1978).

Defendant has been institutionalized in prison and in hospitals on and off since childhood. State and defense psychiatrists concur that defendant is mentally ill. Defendant's mental condition at the time of the offense was the critical issue both at the original trial and at the retrial.

A recounting of the facts of the crimes is unnecessary, as they were adequately recited in our earlier opinion. See *id.* at 522–23, 396 A.2d at 127. Certain aspects of defendant's history and of the detention by police after the crimes, however, lend perspective to the claims presented on appeal and will be detailed in conjunction with our review of those claims.

---

[1] The crime occurred on April 20, 1975. The legislature repealed 13 V.S.A. § 3201 (1974) in 1977, and substituted a new sexual assault statute that is codified at 13 V.S.A. § 3252 (Supp. 1981). The repealing act provided that a rape committed before July 1, 1977, was to be prosecuted under 13 V.S.A. § 3201 (1974). 1977 Vt. Acts, No. 51, § 2.

## I.

Identification of defendant was not an issue at trial. Defendant knew the eight-year-old's mother and, due to an earlier phone conversation, had learned the boy was alone with a baby sitter on the night the crime was committed. Under the pretext of borrowing some phonograph records owned by the mother, defendant identified himself as Kevin West and gained entrance into the house. Ample evidence was presented at trial that defendant used both the name Kevin West and Richard Smith. In addition to learning defendant's name, the baby sitter spent almost an hour with defendant and gave police a complete physical description. When the victim took the stand at trial and was asked to identify defendant, defense counsel stipulated that she pointed to Richard Smith.

During the night of the crimes, both defendant and the rape victim spent time at the Windsor police station, the former having been placed in custody and the latter to give police a statement. The victim was asked if she could identify defendant, whereupon she was led to the room where defendant was being held. An officer opened the door to the room and the victim responded, "[t]hat's him." Three policemen who were present testified about that scenario at trial.

Before that event, defendant had requested counsel and refused to answer any questions. Defendant's attorney, however, had not yet arrived. Defendant claims that testimony concerning the one-to-one, out-of-court show up was inadmissible hearsay and, further, violated his right to counsel and due process rights.

 Since *United States* v. *Wade,* 388 U.S. 218 (1967), courts have struggled to determine when an accused's right to counsel attaches. The *Wade* Court's ruling that the right accrues "where counsel's absence might derogate from the accused's right to a fair trial," *id.* at 226 (footnote omitted), has been interpreted to mean a defendant must be given full Sixth Amendment rights when a "critical stage of the prosecution" has been reached. See *United States* v. *Derring,* 592 F.2d 1003, 1006 n.4 (8th Cir. 1979). Such a stage is reached upon formal charge, preliminary hearing, indictment, information or arraignment, because these mark the beginnings of

a criminal proceeding. *Kirby* v. *Illinois,* 406 U.S. 682, 688–89 (1972) (plurality opinion). See also *Moore* v. *Illinois,* 434 U.S. 220, 228–29 (1977); *United States ex rel. Gray* v. *New York State Board of Parole,* 416 F. Supp. 823, 829 (S.D.N.Y. 1976). Since identification of defendant here occurred before a critical stage of the prosecution was reached, as defined by the above decisions, there was no denial of the accused's right to counsel.

■ Defendant's alternative claim is that the confrontation as conducted was so unnecessarily suggestive and prejudicial that he was denied due process. The practice of one-to-one show ups "has been widely condemned." *Stovall* v. *Denno,* 388 U.S. 293, 302 (1967). However, a due process claim must be viewed in "the totality of the circumstances surrounding [the identification]," *id.,* keeping in mind that the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification," *Simmons* v. *United States,* 390 U.S. 377, 384 (1968).

■ The United States Supreme Court has elucidated factors to be considered in determining whether an identification is reliable even though the confrontation may have been suggestive. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil* v. *Biggers,* 409 U.S. 188, 199–200 (1972).

■ Reliability being "the linchpin in determining the admissibility of identification testimony," *Manson* v. *Brathwaite,* 432 U.S. 98, 114 (1977), it is difficult to imagine a more trustworthy set of circumstances than the one presented by the case before us. See *State* v. *Girouard,* 135 Vt. 123, 134–35, 373 A.2d 836, 843–44 (1977).

■■ Defendant's final challenge to the testimony relating to the pretrial identification hinges on the trial court's interpretation of hearsay evidentiary rules. The witness testified

and was available for cross-examination. Defendant admits that the court's reliance on Federal Rule of Evidence 801(d)(1)(C), defining as "non-hearsay" the statements of a witness relating to a pretrial identification, is technically correct, see *United States* v. *Moskowitz*, 581 F.2d 14, 21 (2d Cir.), *cert. denied*, 439 U.S. 871 (1978), but contends that the testimony in the case at bar exceeded the limits outlined by this Court. While we did specify in *State* v. *Unwin*, 139 Vt. 186, 191, 424 A.2d 251, 254 (1980), that "an out-of-court identification may so unnecessarily suggest the guilt of the suspect that the admission of testimony relating to the identification may be prejudicial," our examination above of defendant's due process claim clearly indicates that the alleged prejudice is not present here.

## II.

Defendant contends that certain statements he made to police officers at the station house on the night of the crime should have been excluded from evidence as violative of his Fifth and Sixth Amendment protections.

Defendant was given his *Miranda* warnings after being transported to the Windsor police station for questioning. He was placed in a small room and held, constantly in the presence of several officers, for a number of hours. Defendant indicated that he did not wish to answer questions without his attorney present and requested his foster parents to contact a lawyer. After that communication, defendant was asked only one question, how old he was. Defendant responded with a "flippant" answer. Defendant subsequently expressed a desire for some law books and discussed the possible penalty for murder. During these remarks defendant stated, "Jesus Christ, you'd think I'd killed the President of the United States."

Defendant filed a pretrial motion to suppress all statements made at the station house before counsel arrived. There was no dispute that defendant was in custody and had requested counsel.

*Miranda* v. *Arizona*, 384 U.S. 436 (1966), held that once an accused in custody has requested assistance of counsel, all interrogation must be halted until counsel is present. *Id.* at 474. *Miranda*, however, does not mandate an exclusion of all statements made subsequent to a request for counsel. "Any state-

ment given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." *Id.* at 478.

In light of these principles, the lower court excluded defendant's answer to the apparently routine question concerning his age, reasoning that age in this case is an element of the crime of rape. See 13 V.S.A. § 3201 (1974) (repealed 1977). The court, however, allowed admission of defendant's statement referring to killing the President, holding that it was voluntarily made and probative of defendant's mental condition shortly after the crime was committed.

Defendant claims that police procedures were so inherently coercive as to preclude the finding that the statement was volunteered. He also contends that the statement was not sufficiently attenuated from the earlier question about his age, which the lower court excluded as being violative of the Sixth Amendment, to conclude that it was voluntarily offered.

■■ The *Miranda* protections from coercive custodial interrogation refer not only to express questioning, but to any police actions reasonably likely to elicit an incriminating response from a suspect. *Rhode Island* v. *Innis,* 446 U.S. 291, 300–01 (1980). "The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of the interrogation and custody would 'subjugate the individual to the will of the examiner' and thereby undermine the privilege against compulsory self-incrimination." *Id.* at 299 (quoting *Miranda* v. *Arizona, supra,* 384 U.S. at 457–58). Defendant's claims in the case at bar must be evaluated in the context of "the perceptions of the suspect, rather than the intent of the police." *Id.* at 301. Defendant had a history of mental instability, and evidence indicates that the police were aware of his emotional problem. "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id.* at 302 n.8.

Defendant's statement came several hours after the conversation about his age, which was ruled inadmissible. Any connection between the two conversations was so attenuated that the "killing the President" statement cannot be considered the fruit of an illegal interrogation. See *Wong Sun* v. *United States*, 371 U.S. 471, 491 (1963). In addition, defendant presented no evidence whatsoever at trial that his statement was provoked by police action. Unlike *People* v. *Golwitzer*, 52 Misc. 2d 925, 929–30, 277 N.Y.S.2d 209, 213–14 (Sup. Ct. 1966), cited by defendant, where the accused, with a known history of emotional instability, was subjected to four hours of intense interrogation, defendant here did not undergo extensive questioning. He remained alone with police for an extended time, but the delay was due to difficulty in locating his attorney. No evidence was offered below indicating that defendant was cajoled or tricked into speaking. In light of the evidence, we affirm the trial court's ruling admitting defendant's "killing the President" statement as voluntarily made and not the result of coercive police practices. Regarding the court's decision that the relevancy of the statement to defendant's mental condition outweighed the prejudicial effect, we view the evidence in the light most favorable to the prevailing party, as we must in reviewing evidentiary decisions, see *State* v. *Carter*, 138 Vt. 264, 266, 415 A.2d 185, 186 (1980), and affirm.

## III.

During cross-examination of an expert testifying for the defense, the prosecutor referred several times to defendant's prior trial. Defendant claims such references were prejudicial and constitute a denial of the right to a fair trial.

Given the clarity of Vermont's law on the subject of referring to prior offenses, see *State* v. *Lapham*, 135 Vt. 393, 406–08, 377 A.2d 249, 257–58 (1977); *State* v. *McMann*, 133 Vt. 288, 290–91, 336 A.2d 190, 192 (1975); *State* v. *Bogart*, 132 Vt. 8, 11–12, 312 A.2d 733, 734–35 (1973); *State* v. *Levine*, 117 Vt. 320, 327, 91 A.2d 678, 682 (1952), it is difficult to imagine why a prosecutor would jeopardize an important case with improper referrals to a prior trial. However, several factors mitigate against the prosecutor's unfortunate strategy constituting reversible error.

■ An examination of the voir dire of the jury reveals that at least six jurors were asked about their knowledge of the prior trial, several of the questions coming from defense counsel. Most knew a trial had taken place and that defendant was convicted. Since defense counsel did not hesitate to refer to the previous trial during voir dire, and since its occurrence was generally known, the prosecutor's remarks were harmless error.

■ Of equal importance, defense counsel did not make timely objection to the remarks about the prior trial, and this Court will not consider on appeal a claim of error not objected to below unless so grave and serious that it "strikes at the very heart of respondent's constitutional rights." *State* v. *Blaine*, 133 Vt. 345, 349, 341 A.2d 16, 19 (1975).

## IV.

As discussed above, the main issue at trial concerned whether defendant, acknowledged to be mentally ill, was culpable at the time of the alleged crime within the meaning of the Vermont insanity defense statute. The test of responsibility for criminal conduct is based on a formula recommended by the American Bar Institute, see *State* v. *Smith*, *supra*, 136 Vt. at 523, 396 A.2d at 127, and is set out in 13 V.S.A. § 4801:

> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks adequate capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
> (2) The terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct. The terms "mental disease or defect" shall include congenital and traumatic mental conditions as well as disease.

Defendant claims that there was no factual basis in the record to conclude that he was not suffering from mental disease or defect at the time of the offense. The State called a psychiatrist who testified that the defendant was suffering from a mental illness. He also testified that a mental illness

can be serious or not serious. He concluded that Smith had a personality disorder with episodes of depressive experience. When asked whether he had arrived at a conclusion as to Smith's sanity on that particular night, he replied that he had.

Q. And what was that conclusion?

A. My conclusion was that he was legally, that he was legally sane as defined in Vermont statutes.

Q. In other words, he appreciated the criminality of his conduct?

A. In my opinion, he certainly did.

Q. And he could conform his conduct to the requirements of law if he had so desired?

A. I thought long and hard about this, and in my opinion he has the ability to control if he chooses.

 Regardless of whether defendant had a mental disease or defect, it is clear that the jury had evidence from which it could have concluded that the defendant did not lack adequate capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

The second paragraph of 13 V.S.A. § 4801, known as the "caveat paragraph," is the focus of defendant's contention that jury confusion on the issue of insanity precluded the possibility of a fair trial. The caveat was enacted "to exclude a defense for the so-called 'psychopathic personality,' " *United States* v. *Brawner*, 471 F.2d 969, 993 (D.C. Cir. 1972) (en banc), and has been the subject of controversy among courts divided over whether the subsection is beneficial in determining insanity and should be presented in jury instructions. See generally *id.* at 993–94. Courts which favor retention of the caveat in jury instructions reason that repeated criminal or otherwise antisocial conduct should not be the sole ground for finding mental disorder vis-a-vis a particular case. *United States* v. *Freeman*, 357 F.2d 606, 625 (2d Cir. 1966). "[A] contrary holding would reduce to absurdity a test designed to encourage full analysis of all psychiatric data and would exculpate those who knowingly and deliberately seek a life of crime." Other jurisdictions, however, do not allow the caveat paragraph to be incorporated into jury instructions, fearing that inclusion confuses a jury without providing elucidation of

the issues to be decided. *United States* v. *Brawner, supra,* 471 F.2d at 993–94; *Wade* v. *United States,* 426 F.2d 64, 72–73 (9th Cir. 1970) (en banc). "The inclusion [of the caveat paragraph] in an insanity instruction should have little or no impact on the determination of the criminal responsibility of any mentally deranged defendant, whether psychopathic or not, since it is practically inconceivable that a mental disease or defect would, in the terms of paragraph (2), be 'manifested *only* by repeated criminal or otherwise antisocial conduct.' " *Wade* v. *United States, supra,* 426 F.2d at 72–73 (emphasis in the original).

 In the case at bar, the lower court judge opted for reading the entire text of 13 V.S.A. § 4801 to the jury. As a matter of law, we cannot conclude that the instructions were so complicated as to deprive defendant of a fair trial. Mention of a history of antisocial behavior was certainly relevant to the case. Had no evidence been introduced concerning defendant's past delinquencies, our decision might be different. In that situation, reading the entire statute might have caused such confusion as to deprive defendant of his rights. Here, however, the instructions were not irrelevant and accurately stated the law in Vermont. In *State* v. *Hanson,* 134 Vt. 227, 233, 356 A.2d 517, 520 (1976), we stated that instructions "should supply the jury with a standard with which it can link the accused's mental condition to his entire personality and conduct so that it might render a just decision." The instructions served this purpose. Defendant has been unable to satisfy his burden of proving prejudice.

 Defendant further contends that, notwithstanding the jury instructions, the prosecutor's reference to the caveat paragraph in his opening remarks misled the jury by inferring that frequent instances of antisocial behavior precluded a finding of insanity. In addition, the prosecutor omitted the word "only" when reciting the caveat paragraph to the jury in his closing remarks. Concerning the opening remarks, since we have found the caveat to be relevant to the case at bar, it was certainly permissible for the prosecutor to refer to the issue in addressing the jury. Concerning the omission of the word "only," any error was rendered harmless by the trial

judge's careful delineation of the elements of 13 V.S.A. § 4801 in his instructions.

## V.

Cross-examination of defendant's expert psychiatrist included interrogation concerning the witness' opinion of mental reports prepared by other doctors who had examined defendant. The defense contends that references to such psychiatric reports violated defendant's Sixth Amendment right to confront witnesses. Defendant's rambling argument appears to concede that defense attorneys opened the door to that line of questioning, the witness on direct examination having referred to hospital records and stating they contributed to his opinion regarding defendant's sanity. Defendant nevertheless contends he was deprived of a fair trial by the examination.

The defendant's expert was the lone witness to argue that defendant was insane. When a witness uses certain sources for the foundation of his opinions, examination of those authorities is obviously a proper strategy. *State* v. *Berard,* 132 Vt. 138, 147, 315 A.2d 501, 508, *cert. denied,* 417 U.S. 950 (1974). "The credibility of a witness is always open to attack, and wide latitude should be allowed on cross-examination for the purpose of showing who and what the witness is, and that he is unreliable, prejudiced, or biased."

Defendant also contends that, in any event, cross-examination should have been limited to interrogation about the other psychiatrists' medical diagnoses and should not have involved their conclusions regarding sanity. Investigation into this area served to question the credibility of the expert witness, and was therefore permissible. See *id.* at 147, 315 A.2d at 508.

## VI.

Defendant's final basis for reversal involves an attack upon his own trial counsel. According to this claim, defendant was without effective assistance of counsel.

Defendant claims that certain aspects of the trial suffered from inadequate counsel: the examination of the State's main expert witness on the subject of insanity; discovery efforts

for the retrial; examination of the rape victim at trial; and the stipulation that she pointed at trial to defendant when asked to identify her attacker. Defendant also contends that the court's instructions to the jury and the prosecutor's references to the rape victim's out-of-court identification of defendant resulted from ineffective defense counsel. We have previously explained the legitimacy of the jury instructions and references to the identification of defendant, so we will restrict this discussion to the other claims.

The claim of ineffective assistance of counsel was entertained by the trial judge after conviction, so we are benefited here with testimony by the defense counsel regarding their trial strategy. That strategy must be measured against the test of whether "representation [was] so rife with shortcomings and of such low caliber as to amount to no representation." *In re Murphy*, 125 Vt. 272, 274, 214 A.2d 317, 318 (1965).

Defendant contends that his attorneys should have explored the area of personal bias during cross-examination of the State's expert psychiatrist who testified on the matter of sanity. That line of questioning had been explored at the first trial, and the witness responded with what defense counsel considered to be a damaging answer. Rather than reflecting a personal bias against defendant, the witness' answer involved a description of a person "who had the symptoms of a personality disorder." Counsels' judgment that the line of examination would not yield a different, more beneficial answer, and that it was detrimental to have the jury hear a psychiatrist speak in terms of a "severe personality disorder," cannot be considered as reflective of ineffective assistance.

Defendant's brief provides no explanation of the claim that discovery efforts were unsatisfactory.

The defense attorneys decided not to press the rape victim on cross-examination. Counsel apparently feared that extensive questioning would invoke greater sympathy for her without yielding any benefit for defendant's case. The decisions not to explore the issue of penetration during the rape, and to stipulate that the victim pointed to defendant at trial, rather than needlessly forcing her to approach defendant, were

reasonable. These decisions did not reflect ineffective or unsatisfactory assistance of counsel.

## VII.

Because defendant is unable to prove that the trial below suffered from any prejudicial, reversible error, the convictions for murder in the first degree and rape will be affirmed.

*Judgments affirmed.*